UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RECEIVED

DEC 1 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TOOLASPRASHAD,
      Plaintiff,

   v.

BUREAU OF PRISONS,
      Defendant

CIVIL NO. 06-1187-ESH

PLAINTIFF'S COMBINED MOTION AND AMENDED
COMPLAINT TO ADD CLAIM AND DEFENDANTS

    Plaintiff respectfully files this combined motion and amended complaint and states the following:

    This action has initially been filed pursuant to 5 U.S.C. § 552, and now plaintiff seeks the Court to allow him to amend and add a 5 U.S.C. § 552a Privacy Act claim against the Bureau of Prisons (BOP) and U.S. Parole Commission (USPC), as well as individual defendants pursuant to 28 U.S.C. § 1331 or Bivens v. Six Unknown Fed. Narc. Agents, 403 U.S. 338, 29 L.Ed.2d 619 (1971). Further, the Court should apply sua sponte the proper statutes necessary to allow this amended complaint to proceed.

    This amended complaint relates directly to the current FOIA action, and in no way will prejudice the defendant(s).

    Therefore, since the BOP is already a defendant, plaintiff respectfully requests that the USPC; Kathleen Pinner, Parole Examiner; Drew Kerr, Psy.D.; Marcia Baruch, Ph.D.; Jamie Berry, Ph.D., Psychology Intern; Kindra Pugh, Ph.D.; be added as defendants in this action. If the Court believes that the individually named-proposed defendants should be removed then the Court should do so sua sponete and add the agency to allow the Privacy Act violation in conjunction with the FOIA to proceed.

    The BOP and USPC and their employees have deliberately falsified plaintiff's record and utilized same to deny parole without cause or penological interest.

THE COMBINED DEFENDANTS FAILED TO TIMELY PREPARE A
PSYCHOLOGICAL REPORT FOR THE PAROLE COMMISSION
WITH A MAY 1, 1999 "INITIAL" DUE DATE WHICH EFFECTIVELY
PREJUDICED PLAINTIFF FROM GAINING PAROLE

1.    On November 2, 1998, plaintiff appeared before the one-person Parole Board at which time a psychological report was ordered and the BOP was to have same to the USPC by May 1, 1999. **(Exhibit 1).**

2.    The report wasn't written, though Drew Kerr ("Kerr"), a now former psychologist ogf FCI Ft. Dix, NJ, assured plaintiff he was writing the report and would be in at the USPC by the May 1, 1999 date. Plaintiff met with Kerr on numerous occasions and only kept asking questions about plaintiff's childhood days and plaintiff effectively became Kerr's plaything. Kerr deceived plaintiff, plaintiff's family, and prison guards who intervened when, in fact, he wasn't writing the report or doing anything.

3.    As the report wasn't furnished by the May 1, 1999 date plaintiff was denied parole, as the USPC misinterpreted and mischaracterized the record and subsequently denied parole and set a new date for the report as November, 2000.  **(Exhibit 2).**

4.    From November, 1998 and up to June, 2000, or 19 months plaintiff repeatedly begged and plead with Kerr; and, guards also intervened to have the report completed and submitted to the USPC, all to no avail.

5.    Kerr repeatedly informed plaintiff and his parents that he was writing the report and would have same submitted by May 1, 1999, however, he wasn't being truthful.

6.    Plaintiff even went to Kerr's superior Marcia Baruch, Chief Psychologist, and "then" Warden Nancy Bailey, both of whom brushed plaintiff aside. Baruch informed plaintiff that the report was being written when in fact it wasn't and Warden Bailey informed plaintiff, "I don't believe the Parole Commission wants the report. You want the report." Plaintiff assured Warden Bailey that the USPC wanted the report and even showed Warden Bailey the USPC Notice of Action (NOA) **(exhibit 1)**, and plaintiff wa sstill brushed aside.

7.    As Kerr kept up the drive with deceiving plaintiff, a complaint was filed with the American Psychological Association (APA), and New Jersey Psychological Association in an effort to get the report written since Kerr wasn't doing anything **(Exhibit 3).** Plaintiff was referred To other professional organizations but Kerr was not a member of any professional organizations.

8.    To show the arduous task plaintiff went through to get the prison administration help to have the report written a listing of requests detailing plaintiff's plight are as follows:

- Request to Warden Bailey dated October 10, 2000, expressing concern about the report, and that other staff members had been supportive and helpful but not Kerr. No Response.
- Request to Warden Bailey dated April 3, 2000, expressing concern about the report and how other staff members had been supportive and helpful but not Kerr. No Response.
- Detailed request to Associate Warden Alexander dated March 20, 2000. Hand-delivered. No Respone. However, about a week later Alexander saw plaintiff walking behind the gym, as plaintiff has to walk by this area to go and come from work and she told plaintiff she ordered plaintiff's request be sealed because of the contents. Still nothing was done.
- Request to Kerr dated January 6, 2000. Hand Delivered. No Response.
- Request to Baruch dated December 10, 1999, in which plaintiff requested to review the report that Kerr repeatedly claimed to have written for the USPC. Hand Delivered. No Response.
- Request to Kerr dated July 25, 1999, informing Kerr that plaintiff was denied parole as the report he claimed to have submitted was never received by the USPC. Hand Delivered. No Response.
- Request to Kerr dated October 28, 1999. Hand Delivered. No Response.
- Detailed request to Warden Art Beeler dated October 2, 1999, expressing concern that plaintiff has been very patient and the action of Kerr. Hand Delivered. No Response.
- Request to Kerr dated October 25, 1999, expressing concern about the report. Hand Delivered. Kerr finally responded October 26, 1999, stating,

> "Mr. Toolasprashad——
>
> I know you have many questions and concerns related to this evaluation; I would like to be able to talk with you about this and have asked the Chief Psychologist (Defendant Baruch) to meet with us. I have scheduled an appointment for Tuesday morning 11-02-99 in Psychology. I hope to see you there."

It should be noted plaintiff showed up for the appointment but Kerr never showed and no meeting ever transpired. Moreover, this no-go appointment was scheduled after six months of the May 1, 1999 due date, or one year since the report was ordered.

- Request to Kerr dated October 9, 1999.  Hand Delivered.
  No Response.
- Request to Kerr dated October 9, 1999 re release of information.
  Hand Delivered.  No Response.
- Request to Kerr dated August 26, 1999.  Hand Delivered.
  No Response.
- Request to Kerr dated February 7, 1999.  Hand Delivered
  with a copy of plaintiff's prison, community, military
  and other documents.  No Response.
  (Exhibit 4).

9.   After the November, 1998 parole hearing plaintiff spoke with Kerr in

November and December, 1998 and, again, in January, 1999, before plaintiff began

submitting written requests.

10.  The Court needs no imagination to see plaintiff has done everything

possible that a prisoner could do to get Kerr to write the report -- and plaintiff's

pleas and cries went in vain.

11.  on countless occasions plaintiff went to the psychology department and

pleaded with Kerr to submit to the USPC the report he claimed to have written - all

to no avail. Plaintiff also sought the help and assistance of both Baruch and even

a Dr. Elizabeth Scott.[1]

---

[1]   Dr. Scott resigned from the BOP late-2000, as she had no interest in the
department because the inmate she was having a sexual relationship with had left th e
prison during summer 1999 and she was in the middle of making plans with him for her
resignation from the BOP and marriage with the former inmate.  In fact, Scott had
assisted the inmate in obtaining college credit instructions via the psychology
department in violation of BOP policy as she surreptiously circumvented the
education department.  Scott even falsified documents in the psychology department
in order to aid the inmate to obtain "graduate" college credits, and preparing
and helping the inmate for a local Boston TV news channel coverage of his release
from prison.   A copy of the video tape was available in the psychology department.
The coverage of the inmate was broadcasted on a Boston TV news program, and the
follow-up story segment was done on a prime time TV news mazagine after scott left
the department and they were married.  On this segment it was revealed that they
were married and Scott was expecting a baby or had a baby from the relationship.
That is, her primary objective during her employment at the time before and during
plaintiff's dilemma with Kerr to get the report written was solely on covering up a
relationship with the inmate, a public relations promotion beneficial to her
future husband and her financial means in Boston, in obtaining certification as a
counselor in the State of Massachusetts for her supposed ward.  Prior to Scott's
resignation, their on-going relationship was the talk of the compound; the inmate
was the clerk at FCI Ft. Dix East Prison psychology department -- he was moved to
FCI Ft. Dix West side from any contact with Scott.  Both FCi East and West
psychology department is under Baruch's immediate control and she knew that a felony
was being committed.  Onviously, Baruch who knew of the relationship didn't give
two-wits about following statutory law, BOP rules, or the BOP Standards of
Employee Conduct, P.S. 3420.09, except when she cares to.  Moreover, on or about
mid-1999, plaintiff spoke with scott in the psychology department and she stated to
plaintiff, "I am not doing the report.  It is Dr. Kerr's job.  I will be quitting
soon, and we don't answer to the Parole Commission. Nothing I can do for you."  At
the time of plaintiff's dilemma the only goal of the pasychology department was to
cover-up the Scott relationship.                          4

12. Even plaintiff's work supervisor went out of his way to assist plaintiff in getting Kerr to write the report as on February 22, 1999, plaintiff requested of his "then" supervisor to prepare a memorandum to Kerr. Said supervisor responded on same date, February 22, 1999, and prepared a memo dated February 25, 1999 to Kerr, detailing plaintiff's work, conduct and his observation. **(Exhibit 5).**

13. Kerr repeatedly deceived plaintiff, his "ill" parents, "then" counsel, and guards who intervened on plaintiff's behalf - all to no avail - as kerr kept up the drive with his deceptive tactics that the report was written and submitted, when it wasn't.

## AFTER PLAINTIFF UTILIZED THE BOP ADMINISTRATIVE REMEDY TO DECRY FCI FT. DIX PSYCHOLOGY DEPARTMENT DECEPTIVE TACTICS, PLAINTIFF WAS RETALIATORY TRANSFERRED TO FCI PETERSBURG, VIRGINIA

14. After plaintiff exhaustive efforts to get help from FCI Ft. Dix psychology department based on kerr's deceptive tactics, plaintiff was retaliatory transferred to FCI Petersburg, where the report was written and contained false, misleading and retaliatory information without any basis of truth or facts.

15. On or about June 6, 2000, about 5:00 p.m., plaintiff was clandestinely shanghai from his housing unit and taken to FCI Ft. Dix East compound (two different prison with the same administration). The two guards told plaintiff that they had no idea what was going on, and even when plaintiff was taken to the medical department at FCI Ft. Dix East, the physician assistant (Bokhari), who was the duty PA told plaintiff he had no idea why plaintiff was moved from the West compound. Pl Plaintiff wa sthen locked-up in a room and about 4:30 a.m. the next morning he was taken to the lieutenant's office where he was shackled and handcuffed, along with another prisoner, taken to Trenton, NJ, airport where he was placed on a private jet (Tail No. US 169 or 169 US) - along with the other prisoner and three guards. Still plaintiff had absolutely no idea what was going on or where he was being taken and for what reasons.

16.   shortly after take-off the airplane landed somewhere in Virginia (presumably Petersburg), wher he was picked up by a lieutenant and another guard and taken to FCI Petersburg.  On the way to the institution the lieutenant who knew plaintiff from many years ago stated to plaintiff that they had no paperwork on plaintiff, no transfer order, only that plaintiff was moved to Petersburg.  The lieutenant also stated to plaintiff that he was surprised to see plaintiff still in prison after several years, and the lieutenant went on stating to plaintiff that "Minority inmates serve much more time than white inmates or American nationals."

17.   Upon arrival at Petersburg, Receiving and Discharge (R&D), the guards placed plaintiff with the pre-trial prisoners.  Subsequently or within a few hours plaintiff was moved two more times within the unit before being placed on the third floor of the hold-over unit.

18.   Plaintiff still had no idea as to why he was at Petersburg and began asking guards the reasons for transfer and none knew as there was no "transfer order" in plaintiff's file.  Not even the Unit Team guards knew why plaintiff was transferred until they called FCI Ft. Dix.  Plaintiff went to the psychology department and inquired and was told by a Dr. Ax that FCI Ft. Dix psychology department requested a "forensic" evaluation for the "Court" (when in fact it was a "general" report for the USPC and Ft. Dix from the beginning had no interest in writing the report as they were covering Scott's relationship with the "then" inmate).  Then within a few days plaintiff was told by Dr. Ax that it wasn't a forensic report, but a general report and that someone else, a student, would prepare the report.  Dr. Ax further informed plaintiff that the psychology department at Ft. Dix could have written the report without hesitation or difficulty which would have been more beneficial for plaintiff at Ft. Dix since the staff personnel knew his conduct, programming, overall demeanor, etc.  Dr. Ax also stated, "Ft. Dix should have written the report.  Its a general report.  Are they that lazy?"

THE REPORT WRITTEN AT FCI PETERSBURG IS INACCURATE,
MISLEADING, AND WITHOUT SUPPORTING FACTS

19.  The report written at Petersburg dated June 23 through July 11, 2000, was supposed to "initially" submitted to the USPC by May 1, 1999.  Plaintiff will challenge the report in specific portions, specifically "behavioral observations," "diagnostic impression," "prognosis," "assessment of dangerousness," and "summary and recommendations." **(Exhibit 6, pgs 3, 5 and 6).**

20.  At no time Berry and Pugh interviewed plaintiff together, considering Berry was a psychology intern.  In fact, absolutely nothing was explained to plaintiff by Berry or Pugh, not about the report or its purpose, or how the report would be conducted. Thus, during the testing of "assessment instruments" used, plaintiff had numerous questions and Berry would leave the room and when plaintiff asked questions, Berry would tell him, "Don't worry about it.  Just put an answer." This was especially so when plaintiff took the MMPI II test which doesn't even appear on the report under "Assessment Instruments and Evaluative Procedures."  **(Exhibit 6).**  The testing process were very short in time; that is, it did not take up much clock time - quite brief the least to say.

21.  While plaintiff was taking the MMPI, he had concerns regarding questions in which the answers would relate to a person in the "free society."  Merely put when plaintiff brought up concerns about the MMPI, Berry told him, "Don't worry about it.  Just put an answer."  Not once Berry looked at plaintiff's questions and offered any guidance.  "Some" of the questions (not all inclusive) plaintiff had reservation about on the MMPI are listed on the reverse side of an envelope he had with him.  **(Exhibit 7).**

22.  At page 3 of the report Berry states,

> "According to information received from the Unit Team at FCI
> Petersburg, Mr. Toolasprashad verbally confronted members of
> his Unit Team and threatened to file a complaint because
> the team did not have all of the documentation he deemed
> necessary, in his Bureau of Prisons (BOP) file.  According
> to his case manager, Mr. Toolasprashad questioned her
> understanding of BOP policy regarding being seen by his unit

team.  Mr. Toolasprashad insisted that he was not required
to meet with team members as a matter of policy."

**(Exhibit 6, pg 3).**

The above statement is not only prejudicial but completely inaccurate.  The

statement indicates plaintiff confronted members of his unit team.  Plaintiff

appeared before the unit team (acting unit manager and case manager) once for about

five minutes and did commented about BOP policy in which the unit team was required

to give plaintiff at minimum 48 hours notice before a team appearance, BOP policy

5322.10; however, plaintiff was given a mere few minutes notice.  A prisoner is

required by policy to follow directives, which plaintiff did by "appearing" before

the team.  However, it is not against policy for a prisoner to cite BOP policy or

to speak or call attention to the unit team matters directly related to the

purpose of which the meeting is being held.  At the team appearance plaintiff was

told by the case manager that they did not have the "transfer order," and that Ft.

Dix could have  prepared the report since plaintiff record did not contained his

Progress Report, program participation documentations.

23.  Plaintiff never indicated that he would file a grievance and, even had he

done so, it is protective activity.  Moreover, he did not questioned the case

manager  about policy; plaintiff commented that it is required for a prisoner to be

given at minimum 48 hours notice before a team appearance -- this would allow time

to gather paperwork of program participation, etc.  (As plaintiff was given a mere

few minutes notice to appear before the team, in a similar sense on October 14, 2003,

plaintiff was given a mere 1½ hours notice for a scheduled parole hearing by his

case manager in which he had to waive.)  Plaintiff did not say he did not have to

meet with the team.  He indicated that the team should be postponed until the

paperwork was received from Ft. Dix and that policy dictates that plaintiff may

"waive" team appearance.  (Team appearance is now mandatory.)  This type of

reporting scheme clearly prevents prisoners and specifically plaintiff from

speaking -- chilling speech -- and prejudicial the least to say.

24. It is worth noting that the comments as written in the report **(exhibit 6, pg 3)**, do not suggest plaintiff was aggressive or insolent toward staff. Plaintiff has always been quite respectful to staff and inmates, the least to say, as so documented in his Progress Report and prison file. However, policy does not place restrictions on prisoners informing guards of policy, nor is being assertive of one's statutory or constitutional rights. No where in policy is a prisoner directed to be a milquetoast. Had plaintiff violated the rules or policies he would have been disciplined, and no where the comments could be characterized as negative.

25. Immediately following the team appearance plaintiff was marched by the case manager to the psychology department and lecture and intimidated by Pugh. Because the case manager went behind closed doors with Pugh, plaintiff knows not what was said, then plaintiff was called in by Pugfh, informed that he shouldn't be reading BOP policy because the BOP could do anything they wish, that she did not want to see plaintiff in the law library filing any complaints against the unit team for the violation. The law library is located in the same building on the first floor about 20-30 feet from the psychology department. In fact, Pugh went to the law library on two occasions and extracted plaintiff from what he was doing to report to her office for very brief lectures and telling plaintiff not to help other prisoners writing letters to family members, and to stay out the law library, etc. (It should be noted that plaintiff was pursuing post conviction remedies on his criminal conviction and abandoned same in fear of Pugh's orders and reprisals.) This is effectively "chilling speech" suppressing a prisoner's first amendment righs of free speech and the rights to address prison staff and the courts - first through the administrative grievance process and later through filing motions in courts. Moreover, it is a violation of BOP policy to deny a prisoner access to the law library when that prisoner is engaged in legitimate and proper activity for which the law library is for, ie, for research and preparation of legal matters.

26.  At page 5 of the report Berry diagnosed plaintiff as follows:

>   Axis I: No Diagnosis
>   Axis II: Narcissistic Personality Disorder
>   Axis III: None

Berry's diagnoses is not only incorrect but there is no facts from the records or otherwise or even the testing conducted to come-up with a narcissistic personality disorder. **(Exhibit 6, pg 3).** Yet, Berry contradicted himself at page 4 ¶ 4 which states,

>   "Mr. Toolasprashad performance on an objective measure
>   of personality is thought to accurately reflect his
>   personality functioning  and is not suggestive of any
>   form of significant psychological impairment."

**(Exhibit 6, pg 3 ¶ 4).**

27.  In a report one year later of Berry's by a "forensic psychiatrist," Dr. Daniel Schwartz ("Schwartz") of more than 30 years experience and testified for the government countless occasions and personally examined more than one-thousand (1,000) murderers effectively  contradicted Berry's report.  Dr. Schwartz is a well known forensic expert by the government.  **(Exhibit 8, Discussion at Pg 3 ¶¶ 4, 5 and 6).**

28.  The discussion of Berry's prognosis is materials directly lifted out of the text utilized by him to prepare this misleading report.  None of the materials are personally directed at plaintiff, rather written in the text.

29.  In Berry's assessment of dangerousness, he went on to discuss a textbook explanation as thus mentioned in ¶ 28 above.  Berry states at pg 5 ¶ 4,

>   "among other factors suggest Mr. Toolasprashad is least likely
>   to present as a danger to the public or to himself is his age,
>   ethnicity, lack of past physically aggressive behaviors, lack of
>   serious mental illness diagnoses, lack of the previous use of a
>   weapon and his behavior while incarcerated.  All of these factors
>   have been associated with a low risk for dangerous behaviors.
>   Individuals with certain age and ethnic groups are least likely to
>   present as dangerous to themselves or society.  Mr. Toolasprashad
>   is in his mid 30's (current age is 43) and is of Asian-
>   Indian descent.  Both of these factors place him in a group of
>   individuals who are least likely to engage in dangerous behaviors.

The above is an accurate assessment by Berry and plaintiff agrees with him though Berry has consistently contradicted himself without facts.

30. At page 6 ¶ 1 (before summary and recommendation) of the report, plaintiff completely disagree with Berry as there is no facts to support his claim. However, plaintiff agrees with Berry's statement of,

> It is important to note, that the possibility of Mr. Toolasprashad being the perpetrator of any behavior likely to harm another is mimimal.

**(Exhibit 6, page 6 ¶ 1).**

31. At page 6 ¶ 2 of the report Berry states,

> "All things considered, Mr. Toolasprashad is believed to personally be at great risk of future dangerousness. He is most likely to respond in non-lethal means and if the situation calls for further responses, he is likely to enlist the help of another in order to initiate more lethal responses."

**(Exhibit 6, pg 6 ¶ 2).**

Berry has once again contradicted himself and placed the comment, "he is most likely to respond in non-lethal means" is directly in **"retaliation"** for the case manager noted to Pugh that plaintiff would file a grievance - chilling speech. **(See ¶¶ 22, 23, 24 and 25 above for explanation).** This is retaliatory in nature and absolutely "chilling speech." Also, it is worth noting that Berry had no facts to support his statement, "... if the situation calls for further responses, he is likely to enlist the help of another to initiate more lethal responses." Rather than basing the report on facts, Berry chose to use plaintiff's criminal conviction that occurred 21-years ago when he was much younger -- as his case is an aiding and abetting murder. This statement by Berry is totally without facts or foundation and he merely used plaintiff's conviction to effectively prejudice him rather than being fair and impartial. The statement is directly out of plaintiff's criminal conviction.

32. At page 6 last ¶ of the report Berry states,

> "Irrespective of whether Mr. Toolasprashad received parole, it is highly recommended that he participate in some form of anger management and assertiveness skill training."

**(Exhibit 6, pg 6, last ¶).**

At no time plaintiff showed any signs of anger, hostility, etc. However, plaintiff was quite tired and sleep-depraved as he was placed in a cell with a total of six prisoners that contained approximately 30 square feet (measured) of moving space in the cell (this include corners between bunks), with temperatures reaching 100-110 degrees fahrenheit (as so stated by guards), and extremely noisy as the unit had bars - not doors. In fact, there was no chairs in the unit to sit and plaintiff had to literally sit on the dirty floors whenever he had to do any writing or needed to get off his feet; when plaintiff asked the unit team guards about chairs he was told that the unit does not allow chairs. Moreover, during the nights there would be large dark roaches crawling on top of plaintiff and on his face waking him up, coupled with loud noise and snoring throughout the night. Indeed plaintiff was extremely tired from the environment/condition to include being around much younger prisoners who were constantly making loud noise. Thus, during the few short-timed tests indeed plaintiff was extremely tired and sleep-depraved. Plaintiff has drawn a diagram on August 13, 2000, of the cell showing the space, and even during the prison 4:00 p.m. stand up count when plaintiff and the other five prisoners were standing the guards even had problems seeing and counting. **(Exhibit 9).** Shortly before plaintiff's transfer back to Ft. Dix two of the beds had been removed from the cell. In fact, plaintiff and other prisoners had to go speak with the chief psychologist guard about the deplorable living conditions and, while plaintiff understands that harsh environment is part of prison life, the court did not imposed a sentence of torture.

33. Even complying with the inaccurate report most stringent recommendations of anger management and assertiveness training, **(see ¶ 32 above),** plaintiff by far surpassed said recommendations and repeatedly been commended by guards of his exceptional conduct, programming and rehabilitative efforts to better himself as he completed the following:

- Alternative to Violence (AVP) basic course, AVP Advanced course, and served as a facilitator for the program. This is a project by the Quakers with civilian volunteers who comes to the institution. Each course is a 4-day workshop from 8:00 a.m. and up to 3:45 p.m. with a 45 minute lunch break. April/May 2001. **(Exhibit 10).**

- Men's Issues, December 12, 2000, then became the facilitator for more than two years. **(Exhibit 11).**

- Anger management, January 30, 2001, then became the faciliator for more than one year. **(Exhibit 12).**

- Mentoring Program, April 10, 2000, then became the facilitator for more than two years. **(Exhibit 13).**

- BOP 500-hour Residential Drug Abuse Program (RDAP), November 15, 2002. Plaintiff was considered a pivotal cog in his class by his fellow prisoners to ensure everyone supported each other to better themselves, which was recognized by the RDAP staff. On October 22, 2003, plaintiff completed the Non-Residential Transitional srevices program relating directly with the RDAP 500-hours program. and, plaintiff has been repeatedly commended by the RDAP staff for helping out the RDAP programs, and even assisted with instructing the Yoga class for the RDAP. It should be noted that the RDAP is the only program within the BOP that is Congressional mandated for a 12 month sentence reduction and six additional months halfway house upon successfully completed the RDAP. **(Exhibit 14).**

At the time Berry wrote the report, plaintiff's file did not contained the above documents of program. Thus some of the programs have been completed after the the report was written. Moreover, the Court can see plaintiff went far beyond the recommendations of Berry's report to better himself, and the prison does not have any other programs to offer plaintiff, which is documented in his Progress Report.

34.  It is important to note that at no time plaintiff's offense was discussed with Berry or Pugh and Berry made his assessment by reading the government's records; not once Berry or Pugh discussed any testing process or even the report to plaintiff.

35.  On september 8, 2000, plaintiff requested from Case Manager Alderman, who was the same guard that prevented plaintiff from speaking, for a copy of the report prepared by Berry and Pugh. On september 12, 2000, Alderman responded,

> "The Unit Team does not get a copy of psychological reports.
> Please address this concern with the psychology department."

**(Exhibit 15).**

36.  Plaintiff went to the psychology department asking Berry for a copy of the report, after Alderman informed that the unit team "does not get a copy of psychological reports," at which time Berry stated to plaintiff,

"The report supports you for parole.  I hope you get out."
Berry further informed plaintiff that he could not release the report and would have to get a copy from Ft. Dix psychology department upon returning to Ft. Dix.  Plaintiff then asked Berry how is he (plaintiff) to challenge any portions of the report if not accurate and Berry informed plaintiff,

"This report is excellent.  Don't worry. You'll be okay
at the Parole Board."

37.  When plaintiff arrived at Ft. Dix and tried to get a copy of the report from his unit team, he was informed that the report was not in his prison file. On September 25, 2000, plaintiff hand-delivered a request to the psychology secretary (who is now a case manager), **(exhibit 16),** addressed to Baruch, requesting a copy of the report. After several attempts to obtain the report, on October 22, 2000, plaintiff was given a copy of the report by Baruch and Baruch stated,

"It's a good report in your favor.  No problem getting
parole with this report  Good luck!"

BERRY AND PUGH'S REPORT WAS EFFECTIVELY CONTRADICTED
ONE YEAR LATER BY A LEADING FORENSIC PSYCHIATRIST
RECOGNIZED BY THE GOVERNMENT OF MORE THAN 30 YEARS

38.  Upon completion of the report by Berry and Pugh, plaintiff's family retained "then" counsel in order to assist with the parole hearing and a report by Daniel Schwartz, M.D., a professor of forensic psychiatry.  Through plaintiff's former counsel arrangements had been made for Dr. schwartz to visit with plaintiff on November 16, 2000, to prepare a report.  While the visit was approved for November 16, 2000 (about 6:45 p.m.) a guard by the name of Walt Jones called former counsel and denied said visit for Dr. Schwartz without cause, when the same type of visits for other prisoners had been approved (plaintiff will provide documentation

through this litigation).  BOP Policy 5267.06 on visiting also allows for parole

representatives as such as Dr. schwartz.  The very next day, former counsel sent off

a letter by overnite mail to Warden Nancy Bailey who never responded.  On May 21,

2001, another letter was sent to Warden bailey and former counsel stated,

> "I have spoken with numerous people at your facility, received
> conflicting information, and still, after months, have not
> been advised as to whether Dr. Schwartz's visit is approved.

Finally, by letter of June 27, 2001, formed counsel faxed a letter to warden Bailey

stating at page 2,

> "If permission is not granted, I will seek permission from
> the Federal Court."

**(Exhibit 17).**

After the June 27, 2001 letter, the visit was approved and arrangements for Dr.

Schwartz to prepare the report.

39.  Plaintiff was to appear at the Parole Board November 2000, but because

the staff were not responding to "then" counsel's letters and inquiries, plaintiff

did not get before the USPC until August 2001, in which Dr. Schwartz appeared and

presented his facts that plaintiff should be paroled – Dr. Schwartz's testimony was

ignored, although a forensic psychiatrist who examined more than 1,000 murderers.

40.  Dr. Schwartz, a Retured Professor of Forensic Psychiatry, State University

of New York Health Science Center at Brooklyn; and, Director, Forensic Psychiatry,

Kings County Hospital Center, and well recognized by the government at pages 2, 3

and 4 states in pertinent parts of his report which was ignored.  Dr. Schwartz

also presented an excellent argument at the USPC (Parole Board) and the audio tapes

were also ignored.  The report states,

In 1983 he saw action in Grenada, caring for the wounded amidst the death of 19 American soldiers. He had a particularly vivid memory of seeing the body of an infantryman who had been cut to pieces in a helicopter crash. The next year he reenlisted and was involved in covert action in Central America, an experience that he describes as "very scary." In March 1985, a fiery helicopter (Black Hawk) crashed at Ft. Bragg took the lives of all 11 men; almost all the bodies were severely burned, and the two pilots had been very close friends.[2]

Mr. Toolasprashad may have very well suffered a Posttraumatic Stress Disorder, feeling "torn to pieces" at the time and experiencing subsequent nightmares of this aircraft and the bodies burning. Reportedly, the Army psychiatrist from whom he sought help dismissed him, telling him that he should be able to handle it himself.

**MENTAL STATUS:**  On examination Mr. Toolasprashad shows no indication of psychosis or even mental illness. He is fully alert and quite cooperative. He is a good historian, with no evidence of organic mental illness. His statements are always responsive, coherent and relevant, with no suggestion of delusion, hallucinations or otherwise disordered thinking. He is initially resentful of the fact that it has taken ten months for this examination to be allowed, but once he has ventilated such understandable feelings his mood is of normal intensity and always appropriate.

In regard to the present offense, he makes it perfectly clear that he feels responsible for what happened. No discussion of the facts leading up to the crime relieves him of any responsibility.

**DIAGNOSIS:**   No Mental Illness
          No Personality Disorder
          No Physical Disorder

**DISCUSSION:** For over 26 years I was the director of a forensic psychiatry service that examined thousands of criminal defendants a year. As such I myself probably seen over a thousand murderers, and have necessarily had to pass judgment as to their dangerousness. I have often rendered pre-sentence recommendations, and have also examined many psychiatric patients who have been found not responsible because of mental illness (NGRI) as to possible release; in both cases, the most important question is their dangerousness.

There is nothing in my examination (or that of Dr. Berry's a year ago) that suggests any risk to the community. There are no paranoid, grandiose or vengeful thoughts or feelings. What happened in this case was between two people, and there is no indication that Mr. Toolasprashad represents a danger to anyone else on earth.

---

2

   Plaintiff was assigned with the Army's largest and only Combat Airborne Aviation unit, and was the only soldier from the medical section assigned to work along with the crash investigation team from the Armed Forces Institute of pathology, Washington, DC, and the Army Aviation Center, Ft. Rucker, AL.

43.  Subsequently plaintiff was denied parole and the USPC changed from the May 1, 1999 due date of the report to on or before November 2000 at the next hearing. **(Exhibit 2 at pg. 2).** Also, the USPC used old psychological reports that was more than 12 years old to deny parole.  additionally, the USPC stated plaintiff failed to accept responsibility for his offense, at the initial hearing, which is not only incorrect and misleading -- as plaintiff consistently took responsibility for his offense and well documented by the BOP.  Thus the USPC has consistently and repeatedly failed to properly review the records, rather misinterpreted and mischaracterized the record at the initial hearing.  In fact, while plaintiff and others were waiting to be seen in the visiting room at FCI allenwood, Pennsylvania, for the 1995 hearing, the Examiner (Essig) was talking with plaintiff and others and he stated, "You guys are not getting parole.  The Commission is going out soon and we have to keep you guys to keep our jobs." hearing this plaintiff was not only afraid but scared to even speak since the decision was already pre-decided.  At the initial hearing plaintiff took responsibility for his offense, although he was very fearful of the Examiner.

44.  An appeal was taken and plaintiff was denied parole as the USPC completely misinterpreted and mischaracterized the incorrect record.  The denial sates is part,

> Although you now argue that you are a good parole risk
> without any mental problems that would cause you to comit
> more violent crimes, and hat you have taken responsibility
> for your original offense, the psychological report from
> FCI Peersburg daed July 1, 2001 [correct date should be
> 2000] given a careful reading, contradicts the claims.

**(Exhibit 18).**

45.  As is obvious the USPC is unequivocally using and have used the false and inaccurate report by Berry and Pugh to deny plaintiff parole, and not even once the USPC even mentioned Dr. Schwartz's report and live testimony at the hearing in August 2001, which shows that the USPC was solely relying on the false and inaccurate report prepared by Berry and Pugh.  At the hearing the Examiner did not even possess Dr. Schwartz or Berry's reports, or the numerous Superior Program

Achievement documents, program participation/completion, etc -- all of which were provided to the USPC.

46.  The USPC is with  autonomous status power and has completely misinterpreted and mischaracterized the false and inaccurate report by Berry and Pugh, just finding anything to deny parole.  The USPC spin is that all psychological ailments are chronic and that no time and therapy could benefit anyone and in this case plaintiff.  Through this litigation plaintiff will provide parole NOA of other prisoners who have been paroled with severe mental disorder and did not encounter an iota of what plaintiff has been experiencing with the USPC.

MARCIA BARUCH'S COMMENTS REGARDING THE REPORT
PREPARED BY BERRY AND PUGH EFFECIVELY SUPPORTS
PLAINTIFF'S RELEASE, ALTHOUGH FALSE AND INACCURATE

47.  Plaintiff obtained a two-page hand-written report from his prison Central File dated 11/21/00 by John Harrington, Unit Manager, summarizing Harrington's conversation with Baruch concerning the report by Berry and Pugh.  In part, the document reads at page 2,

> Marcia B. [Baruch] believes the eval. was
> positive and in inmate's favor.

**(Exhibit 19, pg 2 -- comments of chief psychologist).**

48.  The USPC in denying plaintiff has stated that the report by Berry and Pugh was used in determining the denial.  As noted above at ¶ 47, the assertion by Baruch, according to Harrington's summary and conversation with her, as well as with Dr. Schwartz's report.  As is clear the Berry and Pugh's report was effectively used to deny parole, and it should be noted that at the 2006 hearing the Examiner (Kathleen Pinner) even noted that she wasn't a psychologist, yet she has taken it upon herself and deny plaintiff in both 2004 and 2006 as her decision was pre made.

19

49.  Moreover, at the bottom of page 1 of the hand-written note by Harrington in his summary states (after a conversation with plaintiff's then counsel),

> Bottom line – wants to supplement the BOP's psych.
> evaluation w/one done by Mr. Schwartz.  The inmate
> did not request this be done, his attorney did.

The statement "the inmate did not request this be done, his attorney did" is misleading.  Indeed plaintiff requested of his family to have a report prepared by an independent psychologist/psychiatrist, and plaintiff had spoken with his unit team at the prison, as well as with Kerr about an independent report as far back as December 1998.

### THE PAROLE COMMISSION HAS CONSISTENTLY AND SYSTEMATICALLY USED THE FALSE, INACCURATE, AND MISLEADING REPORT PREPARED BY THE INTERN TO DENY PAROLE AND ADOPTED BY EXAMINER KATHLEEN PINNER AS GOSPEL, ALTHOUGH CONTRADICTED BY TWO LEADING FORENSIC EXPERTS

50.  On January 21, 2004, plaintiff appeared before the one-person Parole Board Kathleen Pinner, in which she used the false, inaccurate, and misleading report **(exhibit 6)** to deny parole, ignoring plaintiff's exemplary prison record, the numerous recommendations from prison staff who observed and supervised plaintiff and denied without foundation.  In the parole denial there is no explanation. **(exhibit 20)**.

51.  Up to two days before the parole hearing, Examiner Pinner refused to allow Dr. Schwartz and plaintiff's parents, as well as BOP Counselor Mike Martinez at the parole hearing, whether to say a few words or as observers.

52.  It was a clear showing that Examiner Pinner's decision was already reached to deny parole, because at the hearing she was hostile, belligerent, and had both plaintiff and counsel intimidated from speaking and presenting an argument which can be verified from the audio tapes.  In fact, although Counselor Martinez was listed on the Parole Application, Examiner Pinner rudely dismissed Counselor Martinez and threw him out of the hearing.

53.  Even though Examiner Pinner used the intern's report to deny parole, the argument of Dr. Schwartz's report (see ¶¶ 40-41 above) was completely ignored that clearly contradicted the intern's report and plaintiff should have immediately paroled.

54.  An appeal of Examiner Pinner's decision was taken and by Notice of Action (NOA) Appeal dated August 23, 2004 and given to plaintiff on September 9, 2004, the intern's report was used against plaintiff and denied parole.  Additionally, the NOA indicates plaintiff "feigned mental incompetency."  (Exhibit 21).

55.  Every step plaintiff goes to he is being stomped on and denied parole based on a decision already made and the false, inaccurate and misleading intern's report  (exhibit 6).

56.  While plaintiff was scheduled for another parole hearing in January, 2006, the USPC scheduled same for February, 2006, plaintiff had to again rescheduled same because FCI Ft. Dix guards refused to allow plaintiff's parole expert to visit with him, and BOP Case Manager Robert Ferretti, also informed plaintiff that Examiner Pinner did not want plaintiff  having the visit in preparation of his hearing.

57.  Finally, after a long battle the BOP approved James H. Hilkey, Ph.D.,[3] to examine plaintiff which took placed on Friday, June 2, 2006, and the parole hearing with Examiner (for the second time) occurred on Monday, June 5, 2006.  And, still Examiner Pinner refused to allow Dr. Hilkey's presence, the presence of plaintiff's parents, and Counselor Martinez, either to say a few words or as observers.  (exhibit 22).

---

[3]
     Dr. Hilkey is retired chief forensic psychologist of FCI Butner, NC, who initially examined plaintiff more than 20 years ago with a team of mental health experts.  Dr. Hilkey was one of the experts on the case of John Hinkley, who had shot President Ronald Reagan.  Combining Dr. Hilkey's 30 plus years and Dr. Schwartz's 40 plus years in both forensic psychology/psychiarty, totaling more than 70 years experience could hardly be ignored, yet Examiner Pinner and the USPC used the intern's report to deny parole.

58.  The highlights of Dr. Hilkey's forensic examination and recommendations:

-  It was our mutual opinion that Mr. Toolasprashad suffered
   from significant mental illness, was considered incapable to
   proceeding to trial, and was treated with psycho tropic
   medications.

-  Toolasprashad does readily acknowledge and is deeply
   appreciative of the sacrifices his family had made in their
   continued support of him and fully recognizes that his
   behaviors contributed to the death of Beverly Dozler.

-  The psychiatric symptoms present during my initial
   evaluation of Mr. Toolasprashad have largely resolved.
   There are no evidences of psychosis present at the time
   of his evaluation in 1987.

-  **I would take exception with the statement in paragraph
   one, page two of the Parole Commission Notice of Action
   Report dated August 23, 2004, that Mr. Toolasprashad "feigned mental
   incompetency." Although the initial concerns that Mr.
   Toolasprashad may be suffering from a schizophrenic
   disorder observed were genuine and were consistent with the
   diagnoses of a Posttraumatic Stress Disorder and a major
   Depressive Disorder. This opinion was supported by two
   independent mental health professionals (Hilkey and O'Brien)
   and reviewed by a panel of other mental health professionals
   during the initial assessment at FCI Butner.**

-  Prior evaluations have referenced an Antisocial Personality
   Diagnosis. Again, Mr. Toolapsrashad does not meet
   the criteria established for this daignosis at this
   current time nor at the time of prior assessments; he has
   no history of conduct disorder as a child or adolescent
   required for this diagnosis.

-  Mr. Toolasprashad has the capacity for sensitivity for
   the needs and feelings of others. Furthermore, his
   behavior while in prison and prior to the offense
   behavior has not included violent or aggressive behavior;
   he has the capacity for empathy as evidenced in his
   repeated concerns for the memory of the victim of this crime and his
   immediate family.

-  The results of objective personality testing recently
   administered do not support an antisocial Personality
   Disorder diagnosis.

-  **Based on impressions obtained from this most recent
   examination of Mr. Toolasprashad I find no reasons to
   suggest that he would pose a future active or passive risk
   to others and on my opinion is a suitable candidate for release.**

(Exhibit 22).

59. On June 5, 2006, plaintiff for the second consecutive time appeared before Examiner Pinner, who refused to allow Dr. Hilkey, plaintiff's family, or even BOP Counselor Martinez at the parole hearing. It was very obvious that Examiner Pinner again used the intern's false, inacurate and misleading report to deny parole. Examiner Pinner's decision was made prior to the hearing, as she was completely closed-minded to any presentation. In fact, Examiner Pinner commented that she wanted plaintiff to remain in prison forever and that she wasn't a psychologist and the decision will be made later and she denied parole. **(Exhibit 23).**

60. Although Examiner Pinner indicated on audio she isn't a psychologist, expert testimony/reports with more than 70 years combined "forensic" experience (Schwartz and Hilkey), fell on deaf ears **(exhibits 8 and 22),** a clear showing how both Examiner Pinner and USPC are bias, prejudice, and close-minded toward plaintiff through a systematically and consistently using false, inaccurate, and misleading information of the intern's report to deny parole.

61. An appeal was taken and the USPC, wherein the argument of the forensic experts (Schwartz and Hilkey, Exhibits 8 and 22) outweighed the intern's report (exhibit 6), as well as plaintiff's extensive positive institutional conduct and programming and was still denied parole. In fact, none of the arguments or recommendations made by Schwartz, MD, and Hilkey, PhD, as well as prison staff recommendations were fit to overcome the intern's report, according to overcome the intern's report, according to Examiner Pinner and USPC and denied parole. **(Exhibit 24).**

62. In the vague and incomplete final denial of November 22, 2006 (exhibit 24) refers back to appeal denial of August 23, 2004 (exhibit 21), which clearly shows how the decision by Examiner Pinner and USPC was pre-made to deny parole.

63.  In the 2006 denial (exhibit 23) by Examiner Pinner she completely ignored Dr. Hilkey's report (exhibit 22), and the appeal denial (exhibit 24) plainly ignored the entire records, a showing that the intern's false, inaccurate and misleading report stands.

### PLAINTIFF HAS CHALLENGED THE INTERN'S REPORT
### THROUGH THE BOP ADMINISTRATIVE REMEDY

64.  On August 19, 2004, plaintiff filed an Informal Resolution (BP-8) challenging the false, inaccurate and misleading intern's report (exhibit 25), and a response by Counselor Hamel dated 8-27-03 stated that plaintiff "may request another evaluation" (exhibit 26) which was an outright misrepresentation of the truth.

65.  On August 28, 2003, plaintiff filed an Administrative Remedy (BP-9) challenging the false, inaccurate and misleading intern's report and that a new report be prepared (exhibit 27), and by response prepared by the psychology department for the warden's signature indicated plaintiff's request for an amended report be denied (exhibit 28) after the informal resolution indicated plaintiff "may request another evaluation." (exhibit 26).

66.  On September 20, 2003, plaintiff filed an Regional Appeal (BP-10) challenging the false, inaccurate and misleading intern's report (exhibit 29), and by response of October 23, 2003 denying plaintiff's request (exhibit 30).

67.  On November 1, 2003, plaintiff filed a Central Appeal (BP-11) challenging the false, inaccurate and misleading intern's report (exhibit 31), and by response of January 7, 2004 stating that there was no evidence that the report was inaccurate (exhibit 32).

68.  At each stage of the grievance process plaintiff requested amending of the information in question as it is easily proven that no evidence exist to support the intern's inaccurate report to include plaintiff's first amendment free speech to file a grievance (¶¶ 22-25 above).

24

EVIDENCE TO PROVE INACCURACY OF THE INTERN'S REPORT THAT
HAS BEEN USED TO DENY PLAINTIFF PAROLE

69.  The two forensic reports prepared by Daniel Schwartz, MD, forensic
professor of psychiatry, who examined more than 1,000 (one thousand) murderers
(exhibit 8); and James H. Hilkey, PhD,[4] forensic psychologist, who initially
examined plaintiff more than 20 years ago with a team of mental health
experts (exhibit 22), clearly and unequivocally refuted the intern's report
(exhibit 6).  Additionally, the voluminous accomplishments by plaintiff during his
21 years of confinement and the numerous recommendations by prison staff
recommending plaintiff's immediate parole have been ignored by the USPC
(exhibit 33).

## CONCLUSION

70.  It is obvious that the USPC, who are not forensic mental health experts,
spin is that all psychological problems are chronic and that no time could benefit
a person which is clear in this case.

71.  As Examiner Pinner denied plaintiff at his 2004 hearing where she was
hostile, belligerent, intimidating, and her decision pre-made, she should not have
presided at the 2006 hearing in which she relied on her previous decision of 2004,
a decision clearly pre-made.  Additionally, Examiner Pinner consistently and
adamantly denied plaintiff's experts, family members, and BOP staff to attend the
hearing to either say a few words or as observers.

72.  The intern's report has been contradicted by both leading forensic experts:
Dr. Schwartz and Dr. Hilkey and, yet, the Examiner and USPC had pre-decided

---

[4]

    See fn. 3 at page 21.

plaintiff's case to deny him parole.[5]

## RELIEF SOUGHT

1.    As two leading forensic experts with a combined 70 plus years experience contradicted the intern, that the intern's report be stricken from the record and a new parole hearing immediately conducted;

2.    That the USPC allow plaintiff's experts, family members, and BOP staff at his hearing;

3.    That Examiner Pinner be excused from hearing the case as she is bias, prejudiced and pre-decided the case;

4.    As plaintiff's release has been curtailed by the intern's report, which was used to deny parole, that the Court grant whatever relief the Court deems proper in striking the intern's report and adopted the two forensic experts' reports;

5.    Order the USPC to provide a 1985, 1986, or 1987 U.S. Parole Manual, as the USPC is using "current" procedures against plaintiff and not that of 1985, an ex post facto violation. (Plaintiff has written to the USPC and was told no such manuals exists, only current manuals);

6.    That the Court award plaintiff cost for bringing this action;

7.    As plaintiff has no legal training that the Court apply sua sponte the correct law/statutes to allow this amended complaint to proceed as a Privacy Act

---

[5]    At plaintiff's June 5, 2006 hearing while standing in the education building a along with two other prisoners waiting for the arrival of Examiner Pinner, as soon as Examiner Pinner and BOP guards Robert Donahue, Case Manager Coordinator, walked in Donahue stated, "Coles, why are you here?" and inmate Coles replied, "For my hearing." Exainer Pinner stated, "You've been paroled" and Donahue stated, "You have a date for August 30, 2006." Coles was dismissed and Examiner Pinner and Donahue went behind closed door to hear another prisoner and plaintiff. It is plaintiff's understanding as so stated by BOP staff that Coles release date was 2020, but he was paroled on August 30, 2006; the other prisoner's release was 2013 and received a parole date for March 2007. This is very clear indication that Examiner Pinner's decision was pre-made and she should not have been allowed to hear plaintiff on June 5, 2006 after denying plaintiff in 2004, as plaintiff's hearings are every 2-years.

claim.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Latchmie Toolasprashad
#10975-056
Building 5803
PO Box 7000
FT. Dix, NJ   08640

## CERTIFICATE OF SERVICE

I hereby certify that a copy of:

"Plaintiff's Combined Motion and Amended Complaint to Add Claim and Defendants"

has been mailed postage prepaid by depositing same in the U.S. Mail on this the 9th day of December, 2006, addressed as:

Marian L. Borum
Assistant U.S. Attorney
555 Fourth Street, NW
Room 481
Washington, DC   20530

Latchmie Toolasprashad

27