RECEIVED

JAN 1 2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOOLASPRASHAD,
      Plaintiff,

    v.

BUREAU OF PRISONS,
      Defendant

CASE NO. 06-1187 (ESH)

PLAINTIFF'S OBJECTIONS TO DEFENDANT'S RENEWEWD
MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT

Plaintiff respectfully files this objections to the following which he
received on Tuesday, December 26, 2006:

1. Defendant's Renewed Motion to Dismiss or, in
   the Alternative, for Summary Judgment
2. Statement of material facts not in Genuine Dispute
3. Defendant's Memorandum of Points and Authorities in support
   of Renewed Motion to Dismiss or, in the Alternative,
   for Summary Judgment.

Plaintiff also received the Court's Order of December 14, 2006 on December 20,
2006 at about 5:15 p.m.

I.

Defendant asserts that plaintiff failed to state a claim upon which relief
may be granted and there is no genuine issue as to any material fact and believes
summary judgment is appropriate. These so-called assertions must fail because
indeed plaintiff stated a claim as well as genuine material facts, as defendant
failed to maintain plaintiff's record with accuracy and reasonableness to assure
fairness, aswell as deliberately falsifying and fabricating his records which
caused an adverse determination in the denial of parole.

The second supplemental declaration by BOP-guard Kathleen Quigley at page 2 ¶ 3
indicates plaintiff sought a copy of psychological records. Plaintiff sought
"the entire file" and the approximately 500 plus documents. At ¶ 10 of Quigley's
declaration indicated that the case manager (Robert Ferretti) searched plaintiff's
Central File for the documents. Also, at ¶ 11 Quigley indicated that 123

pages of military documents was located in the Central File and forwarded to a forensic psychologist identified by plaintiff.[1]

The declaration by Robert Nagle and Robert Ferretti will be explained below which lacks merit in an effort to cover-up for their ineptness.

According to both the Court's Order of December 14, 2006 and defendant's various documents mentioned above instructed that plaintiff's failure to respond, the Court will accept defendant's motion for summary judgment. Therefore, plaintiff is indeed responding.

II.

Concerning defendant's statement of material facts defendant indicated are in genuine dispute is meritless and summary judgment should be denied and further proceedings taken by this Court.

In ¶ 1 indeed plaintiff requested a copy of the "entire file," which defendant failed to comply with to include failure to comply with the FOIA/PA statutory time limit in  responding and plaintiff had to initiate this action. (See, "Plaintiff's Combined Affidavit, Objections to Defendant's Motion to Dismiss, Defendant's Statement of Material Facts Not in Genuine Dispute, and Defendant's Memorandum" dated September 20, 2006, **Doc # Unknown.**)  Quigley's declaration indicated plaintiff's FOIA request was received by the BOP on or  about April 5, 2006.  Although Quigley indicated that plaintiff's request was received April 5,

---

[1]
    The forensic psychologist, Dr. James Hilkey, is retired chief forensic psychologist of FCI Butner, NC, and also former professor of University of North Carolina - Chapel Hill, who initially worked on plaintiff's criminal case in 1986. Moreover, Dr. Hiley, examined plaintiff on June 2, 2006 at FCI Ft. Dix, NJ, after the prison administration repeatedly refused to allow Dr. Hilkey to examine for well over 18-months, travelling from NC, in which Dr. Hilkey clearly indicated plaintiff should be released from prison.  (See, "Plaintiff's Combined Motion and Amended Complaint to Add Claim and Defendants" dated December 9, 2006 for details, **Doc # Unknown.**)  Dr. Hilkey is a leading forensic expert who was also an expert on the case of John Hinkley who had shot President Ronald Reagan.

2006, plaintiff received no response and an appeal was filed April 19, 2006 and received by the BOP on April 28, 2006 (See, Complaint Exhibits 1, 2 and 3), and still defendant totally disregarded statutory provisions and never responded to the FOIA request/appeal until initiation of this action.

In ¶ 2 plaintiff has no way of knowing the facts of the assertion by Quigley concerning the FOIA number and no date was provided as to when the BOP assigned such FOIA number to plaintiff's request which perhaps may have shown said number assigned after initiation of this action.

In ¶ 3 defendant is correct that plaintiff placed the BOP on notice and, still, the BOP failed to timely respond to the FOIA request. That is, on April 19, 2006, plaintiff mailed the FOIA Appeal which was received April 28, 2006 (See, Complaint Exhibits 2 and 3) and the BOP refused to respond timely as provided by statute.

In ¶ 4 defendant indicated that on June 5, 2006 the BOP Northeast Regional Office sent a request to FCI Ft. Dix. Plaintiff has no knowledge of this assertion, because no timely response was filed by defendant to plaintiff's FOIA request/appeal.

In ¶ 5 defendant indicated plaintiff filed the instant complaint on June 30, 2006. Plaintiff initiated by placing the Complaint in the U.S. Mail on June 14, 2006 in which the mail box rule apply that whenever plaintiff delivered same to a prison guard it is deemed filed. Moreover, the Docket Sheet shows the Complaint received June 29, 2006.

In ¶ 6 defendant indicated that 46 pages of documents were sent to a forensic psychologist identified by plaintiff; however, defendant at said stage nor Quigley identified Dr. James Hilkey by name.

Plaintiff contends that no response is required to defendant's ¶¶ 7-10.

In ¶ 11 defendant indicated that on December 4, 2006, 123 pages of military documents was released. Plaintiff asserts that the 123 pages of documents released are not the documents in question, as these are old documents from plaintiff's Central File in possession of Robert Ferretti, Case Manager, and someone plaintiff should consider litigate an action against for bungled plaintiff's parole hearings. Moreover, Ferretti's declaration, nor Quigley, or defendant document failed to identified the documents merely that 123 pages were released. In fact, on November 30, 2006 at about 11:25 a.m., plaintiff identified in Ferretti's hands walking out the unit with plaintiff's Central File -- assuming delivering same to the FCI Ft. Dix corrupt legal office reun by corrupt-lying guards Nicole Ahmed and Tara Moran -- two guards well known for outright obstruction and interfering with prisoners' administrative remedy complaints. It is worth noting to the Court indeed plaintiff reviewed his Central File previously and the 123 pages of documents were not and are not the documents being sought in this action. What defendant is doing is merely providing any documents to indicate documents were provided and a search conducted in various locations in an effort to overcome summary judgment, when in fact, defendant doesn't even know what or where the 500 pages of documents are located through their tardiness and sloppy recordkeeping since there is no oversight against the corrupt BOP and its guards --and through this corruption and sloppiness creates adverse determination against plaintiff. That said, the 123 pages of documents from plaintiff's Central File are not the documents under request.

For argument sake, be this the case if 123 pages of documents was recovered from plaintiff's Central File, can the Court please get the defendant to explain where is the approximately 377 other documents are when Robert Ferretti is required to maintain program completions/certificates/memorandums, etc., in the Central File? As noted above plaintiff reviewed the Central File and the documents are non-existence, a showing of a Privacy Act violation wherein an

4

adverse determination has been made in that plaintiff was denied parole through the retaliatory tactics applied by the BOP and its guards.

### III.

In defendant motion, their ¶ 1 is an outright lie as it indicates plaintiff requested release of the psychological report prepared by psychology-intern Jamie Berry between June 23 and July 11, 2000.  Plaintiff requested the "entire file" which would show that the report contains retaliatory, false and inaccurate information which was used adversely against plaintiff to deny parole.  Defendant exhibit 2 and Quigley's declaration are vague and incomplete and failed to address the issue.  Indeed, plaintiff still contends that approximately 500 plus documents are outstanding and missing through defendant's tardiness and care-not attitude in its recordkeeping as there is no oversight to the BOP nightmare of corruption, because the "keepers of the keys" outright hide the corruption behind the BOP uniform of corruption.

The 123 pages of documents outlined in Ferretti's declaration ¶¶ 3 and 4 are not the documents under request.  (See above, in addressing defendant's ¶ 11 for detail in which this 123 pages are not the documents.)  Quigley's Supplemental Declaration ¶¶ 10, 12 and Ferretti's exhibit 7 are not the documents under request. All defendant is doing is merely supplying "any" documents in an effort to get the Court to grant them summary judgment in that they've conducted a search of plaintiff's Central File.  This scheme must fail.

Plaintiff clearly states a claim upon which relief can be granted.  Defendant had possession of the documents and the documents disappeared while in the BOP possession, leading to an adverse determination against plaintiff.

Throughout this action genuine issues of material facts exists and summary judgment is inapproprate and the defendant must provide the documents or strike the so-called psychology-intern's report prepared by psychology-intern Jamie Berry, which was used against plaintiff to deny parole, and contradicted  by two leading

forensic experts with combined 70 plus years' experience: James Hilkey, PhD, Forensic Psychologist; and, Daniel Schwartz, MD, Forensic Psychiatrist.[2] That is, the psychology-intern report must be struck from the record to assure fairness to plaintiff and a new parole hearing conducted, utilizing the two forensic experts' reports: Hilkey (who initially examined plaintiff in 1986 and 1987 while he was chief forensic psychologist at FCI Butner, and most recently on June 2, 2006 at FCI Ft. Dix), and Schwartz (who personally examined more than 1,000 murderers).

Sellers v. Bureau of Prisons, 959 F.2d 307, 312 (D.C.Cir. 1992) dealing with a parole issue similar as such confronted by plaintiff holding, "As long as the information contained in an agency's file is capable of being verified, then, ... the agency must take reasonable steps to maintain the accuracy of the information fails to maintain its records in that way and, as a result, makes a determination adverse to an individual, then it will be liable to that person for money damages." Here, defendant deliberately, willfully, intentionally, and knowingly falsified the psychology-intern's report to cause plaintiff irreparable harm, when in fact, the 500 plus documents that cannot "now" be located would have been favorable to plaintiff. That is, plaintiff was retaliated against and the psychology-intern's report contains false and inaccurate information that could have easily verified; however, as plaintiff challenged the defendant -- the documents disappeared.

In a similar sense and a classic example is that after plaintiff caught medical guards deliberately, knowingly, intentionally, and willfully falsifying his medical records to cover-up, and said medical records for a 10 year period miraculously disappeared from December 27, 1996 to January 11, 2005, as

---

[2]

See, fn 1 at page 1. Also, Dr. Schwartz personally examined more than one thousand (1,000) murderers and had to determine their denagerousness. (See, also the Amended Complaint for details and facts, **Doc # Unknown.**)

acknowledged by FCI Ft. Dix Warden Charles E. Samuels, Jr. Additionally, even when
plaintiff provided evidence that medical guards falsified the records on at least
four occasions in that plaintiff failed to show-up for cardiology and orthopedic
appointments, the Assistant Health Service Administrator (Durr), a known liar and
spinner prepared the response for Warden Samuels' signature that plaintiff
provided no evidence. The attached so-called administrative remedy concerning the
medical records is explained to show the sloppy record keeping by the BOP, when
medical records is only in one location and difficult to believe same disappeared
in a one-floor highly secured area at FCI Ft. Dix. This is no different that that
of the 500 plus documents disappeared while in the psychology-intern's possession -
then fabricated and falsified the psychology-intern's so-called report that was
used to deny parole. **(Exhibit 1).** How is it possible for prisoners as such as
plaintiff to experience fairness when complaints are filed against guards are the
same ones preparing responses for the warden's signature and the warden just signs-
off on these responses as though nothing is wrong.[3]

IV.

Defendant's arguments is without merit and must be rejected:

SEARCH CONDUCTED

Defendant indicated that in response to plaintiff's request, the BOP requested
documents from FCI Ft. Dix, in which according to Quiglel the psychology guard
forwarded the documents in the Psychology Data System (PDS).[4] According to Quigley
46 pages of records had been identified and forwarded to plaintiff's expert, Dr.

---

[3]

Plaintiff has been in prison for 21 plus years and confined at 14 gulags, although
a first time offender, and has witnessed the proliferation of the out-of-control
corruption from the top to the bottom in which guards at all levels are related
with each other. They lie, cover-up, obstruct, hinder and are outright worst
criminals than what they are keeping, as guards have repeatedly stated they have
the judges, US Attorneys, FBI, OIG, congress, internal affairs, and other agencies
to protect them. Some of this corruption barely surfaced when a fedreal agent of
the OIG was murdered by the "BOP professional, corrupt guard" at FCI Tallahassee on
June 21, 2006. **(Exhibit 2).**

[4]

The BOP maintains the PDS, as a computer file on all prisoners.

Hilkey.  Quigley nor the defendant indicated name(s) of the psychology guards who furnished the 46 pages to the regional office.  Moreover, plaintiff clearly indicated that the documents existed at FCI petersburg, yet the request was made by defendant to FCI Ft. Dix, as plaintiff clearly identified the documents, dates, place and location.

Indeed, plaintiff is openly accusing the BOP and its guards of corruption from the top to the bottom, as the psychology report was assigned to psychology-intern Jamie Berry, and the documents (the 500 plus documents) was provided to the appropriate guard -- the psychology-intern guard -- Berry -- who had an obligation to secure those documents and used same in a fair and equitable manner to assure fairness to plaintiff.  Instead, the psychology intern had no interest in performing his job in a professional manner, only getting through the internship to successfully complete his doctorate, no experience and no supervision.  (The plaintiff does more counseling each day of his fellow prisoners than what the combined psychology guards perform.)

Defendant finally contacted a psychology-guard, Dr. Robert Nagle, at FCI Petersburg as to the 500 plus documents, and Nagle was directed to conduct a search. Nagle at ¶ 4 of his declaration  merely reiterates what he was told; at ¶ 7 of his declaration, Nagle indicated during the time of the psychology report four guards were participating in "internship" and a file is kept on each guard, wherein the files do not contain any documentation related to individual prisoners - in this case plaintiff -0 and that the files did not contain the 500 plus documents.

At ¶ 8 Nagle indicated plaintiff wasn't at Petersburg for a forensic evaluation, although the psychology guard at FCI Ft. Dix (Drew Kerr) insisted that FCI Ft. Dix couldn't do the report because it was a forensic report when in fact it wasn't a forensic report -- and plaintiff repeatedly indicated such to Kerr that it wasn't a forensic report.  However, at FCI Ft. Dix plaintiff repeatedly informed the the psychology guards that it wasn't a forensic report, and after a mountain of lies by FCI Ft. Dix psychology guards, plaintiff was retaliatory transferred to

Petersburg to have the report prepared.  Plaintiff was taken in a private jet at
taxpayers expenses, wherein the general report could have been prepared at FCI Ft.
Dix, and submitted by the initial due date of May 1, 1999, when the report wasn't
prepared until mid-2000 and plaintiff denied parole based on the false and
inaccurate psychology-intern's report.  (See, "Plaintiff's Combined Motion and
Amended Complaint to Add Claim and Defendants," dated December 9, 2006, for a
detail explanation, Doc # Unknown.)

    At ¶ 9 of Nagle's declaration he indicates that it is not normal procedure at
FCI Petersburg  psychology department to accept these documents from prisoners, and
if the psychology guard accepts same, it may be reviewed the returned to the
prisoner.  Further, Nagle indicates there is no evidence that plaintiff provided
these documents to any guard(s) of the psychology department at Petersburg.  First,
Nagle never indicates that the practice  of not accepting documents from prisoner(s)
at Petersburg is a practice at that gulag only or a national policy throughout the
BOP; secondly, Nagle never indicated that the psychology-intern guard (Berry) was
instructed not to accept the documents from plaintiff; and, thirdly, Nagle implies
plaintiff is a liar because no evidence any guard(s) from the psychology department
ever took possession of the documents.  But Nagle, who is the lying bureaucrat that
he is, never indicated that the psycholog-guard-Berry was contacted.  Plain and
simple Nagle is a liar covering up the bungled record keeping process and how the
psychology-intern are trained.  In fact, plaintiff draws the Court's attention to
the falsified and fabricated psychology-intern's report at page 3 ¶ 3 in which the
report states in pertinent part,

"Mr. Toolasprashad was cooperative throughout the evaluation. He voluntarily submitted documentation of his work evaluations, certificates of completed training and accommodations received while in the Army and the Bureau of Prisons."

(Exhibit 3).

The above statement directly out of the grossly false, inaccurate and misleading psychology-intern's report quite clearly contradicts Nagle's declaration that there is no evidence of plaintiff providing the documents to any psychology guards. Moreover, plaintiff will challenge the grossly false, inaccurate and misleading report that was utilized adversely against him to deny parole upon the Court allowing the Amended Complaint as a Privacy Act issue to proceed. Plaintiff has proved Nagle's declaration is an outright lie and cover-up. In fact, during this litigation plaintiff will challenge the entire report which absolutely contains an abundance of false and inaccurate information used adversely against plaintiff.

Nagle indiactes at ¶ 6 that using plaintiff's prisoner number he conducted an electronic search of the PDS and none of the documents were located provided to the intern. According to the lies by nagle, the defendant and BOP guards, the only way to remove any doubt or the word "alleged" when dealing with these lying bureaucrats when documents are concerned as situation as this is to mail by Certified Mail Return Receipt to prove how the BOP and its guards are outright liars at all levels. Obviously Nagle is the typical bureaucrat, or implying this Court cannot see beyond what is directly in front the Court eyes. That is, Nagle indicates that the PDS is an electronic file (See, fn 3 at page 7), wherein the care-not psychology-intern would not have scanned those 500 plus documents and place same on the PDS, so there was no reason for Nagle to insult both plaintiff and the Court that he searched the PDS for the documents.

Whether or not it is normal procedure of the psychology guards accepting documents from a prisoner is not the point. Nagle indicates no evidence plaintiff provided the documents to any psychology guards (Nagle at ¶ 9), yet Nagle indicated he became a licensed psychologist in 2002, he was not at Petersburg in 2000 when the intern prepared the false and inaccurate report. Moreover, the psychology-intern Berry had no interest in plaintiff other than completing his internship. But according to Nagle's declaration he is defending the psychology-intern-guard (Berry) and procedures he could not have had any idea of in 2000. Further, Nagle indicated he contacted Berry.

Defendant indicated that psychology records are not maintained in a prisoner's Central File, and plaintiff has access to his Central File. Also, defendant indicated plaintiff's Central File was searched and no such records was located, yet 123 pages of military documents of this 500 plus documents was located. Someone is lying and it is not plaintiff, rather the BOP and its guards. If the Central File does not contain such records/documents, then why was the Central File searched? The obvious answer is simple: defendant cannot locate the documents and in an attempt to overcome summary judgment, searched the Central File showing the Court a search of another location was conducted. (Plaintiff needs not reminding this Court that his medical records for a 10 year period miraculously disappeared after plaintiff caught medical guards falsifying his medical records. See, above.)

## ADEQUACY OF SEARCH

The declarations by Quigley, Nagle and Ferretti failed to end the search, as they have failed to contact the psychology-intern-guard regarding the documents. It does not take a genius that searching the PDS (electronic files) would yield negative results; and searching the Central File (by Ferretti) would also yield negative results as defendant indicates the Central File does not

contain psychology records. So defendant is fooling this Court by providing any
search locations, as an excuse that a search has been conducted. And, the
psychology-interns' files only contain personnel information. There is no
indication that the psychology-guard Kindra Pugh who was "allegedly" supposed to
supervise psychology-intern-Berry was contacted or even Berry. Therefore, the
search is not adequate.

In an effort to kick sand in the Court's eyes, defendant claims to have
searched the Central File, a location where psychology records are not maintained
(according to defendant), still 123 pages of military documents which are not the
documents have been identified and these documents should be removed from the
Central File. Plaintiff previously reviewed the Central File and the 123 pages of
documents are not the documents under controversy.

### DEFENDANT HAS NOT RELEASED THE REQUESTED DOCUMENTS

Defendant and its guards have deliberately, intentionally, knowingly and
willfully destroyed and/or hiding the 500 plus documents in this action to cover-up
an inaccurate, false and misleading psychology-intern's report which was utilized
to deny plaintiff parole, when same was contradicted by two leading forensic
experts with combined 70 plus years' experience. In a similar sense the BOP has
lost 10 years of plaintiff's medical records after plaintiff discovered guards
falsified his medical records **(Exhibit 1).**

The 46 pages and 123 pages does not have anything to do with the 500 plus
documents under request. And, Nagle and his fellow BOP guards merely provided
declarations indicated searches in which they acknowledged documents do not exist
in an effort to support their employer - the corrupt BOP - to defeat plaintiff --
covering up their own ineptness and incompetency. This Court cannot expect a
better example of the BOP conveniently loosing plaintiff's medical records from
1996 to 2005 **(Exhibit 1),** in a similar sense of the 500 plus documents disappeared
because the psychology-intern had no interest in the accuracy of the report,
rather only completing his internship.

12

Whether or not defendant conducted an adequate search, no evidence has been provided that the guard-Kindra Pugh, who "allegedly" was supervising the psychology-intern-Berry was ever contacted, or even Berry. Therefore, the search is incomplete. The only good faith shown by the BOP and its guards are covering up and lying for each other. Plaintiff is not speculating that the documents exists, the search is incomplete as Pugh and Berry was never contacted and psychology-intern Berry fabricated and falsified the report rather than preparing same with accuracy to assure fairness.

COSTS

Plaintiff is entitled to his cost as defendant never responded to the FOIA/Appeal and this action had to be initiated because of the defendant's failure to comply with statutory time limit of responding. Defendant only filed a response to the request through initiation of this action. Had defendant responded within statutory time limits to the FOIA/Appeal, there would have been no need for plaintiff to initiate this action.

AMENDED COMPLAINT

In an order dated December 22, 2006, the Court issued an order denying as moot defendant's motion for an enlargement of time, noting plaintiff's amended complaint has been properly docketed. Defendant has not yet answered same and the Court should withhold decision on summary judgment on the FOIA part until a response is filed, because defendant indeed used the false psychology-intern's report adversely to deny parole.

13

## CONCLUSION

The plaintiff is not permitted to "verbally" speak freely and guards often take retaliatory actions whenever a prisoner speaks even in writing. Hinebaugh v. Wiley, 137 F.Supp.2d 69, 78 (N.D.N.Y. 2001) holding, "It is well settled that prisoners have a constitutionally protected first amendment right to petition the government for alleged grievances.... In accordance with this rule, Courts have held that when a prisoner files a written grievance with the government containing 'hostile, sexual, abusive or threatening' language he may not be punished for filing it. Bradley, 64 F.3d at 1282. To hold otherwise forces a court to draw a hazy line between hostile and abusive language and honest, unabashed airing of a grievance, 'leaving the aggrieved prisoner guessing whether he will be punished for what he has said in his formal prison complaint.' Id. at 1281. 'If there is any time a prisoner should be permitted to speak freely, it is at the bar of justice.'" Id.

The Court should deny summary judgment, order defendant to contact guard-Kindra Pugh and psychology-intern-guard Jaime Berry regarding the 500 plus documents, as well as appropriate action regarding the amended complaint.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Latchmie Toolasprashad #10975-056
Building 5803, PO Box 7000
Ft. Dix, NJ  08640

Dated:   January  9 , 2007

## CERTIFICATE OF SERVICE

I hereby certify that a copy of "Plaintiff's Objections to Defendant's Renewed Motion to Dismiss or, in the alternative, for Summary Judgment" has been mailed postage prepaid by depositing same in the U.S. Mail on this the 9th day of January, 2007, as:

Marian L. Borum
Assistant U.S. Attorney
555 Fourth St., NW., Civil Division
Washington, DC  20530

Latchmie Toolasprashad

14

U.S. DEPARTMENT OF JUSTICE                                    REQUEST FOR ADMINISTRATIVE REMEDY
Federal Bureau of Prisons

---

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

**From:** TECLASPRASHAD, LATCHMIE    10975-056    5803    FTD
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A– INMATE REQUEST**

A copy of my medical records was requested 4/28/06 via cop out and response of May 12, 2006 indicated that I'd be placed on callout, once the copies were made. Additionally, I previously spoke with one of the MRT about the records, and that staff was belligerent without any avenues to ask question(s).

On September 11, 2006 a BP-8 was initiated for a copy of every document in my medical record. Response to the BP-8 of 9/15/06 from Counselor Hamel instructed me to report to medical records on Monday, 9/18/06 at 10:30 am for "a copy of the past year's record."

As instructed, I reported to medical on 9/18/06 at 9:55 am. At 10:39 am, Dr. Turner opened the medical records garage window calling names of her patients, at which time I approached and told her that I was there to pick up medical records as instructed and she stated, "they'll call you!" assuming "they'll call you" to be the records staff who were sitting there. Turner closed the window. At 10:44 am, Processor opened the window and called "merry-go-round" and immediately closed the window without allowing any question(s). Still, I waited until 12:05 pm and wasn't called, at which time I returned to work.

     DATE    9/28/06    See Page 2      SIGNATURE OF REQUESTER

**Part B– RESPONSE**

EXHIBIT 1

---

     DATE          WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**      CASE NUMBER: 429114-F1

         CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

_____
     DATE     ✪     RECIPIENT'S SIGNATURE (STAFF MEMBER)     BP–229(13)
                                                 APRIL 1982

TOOLASPRASHAD #10975-056
Page 2, BP-9

After the spin and dance as mentioned above of 9/18/06, a BP-9 was initiated;
however, Counselor Hamel once again intervened and the BP-9 wasn't required
processing. I was then placed on callout for 9/27/06 at 10:30 am; I received
and signed for 36 pages of documents with a break-down as follows:

> 1 <u>blank</u> sheet of paper
> 4 pages of the same consultation sheet
> 1 page Consultation sheet
> 2 pages of the same document (x-ray report)
> 2 pages of medication prescribed
> 2 pages of a lab report
> 1 page EKG
> 1 page from the Utilization Review Committee
> 1 page — medical treatment refusal
> 11 pages -- SF 600s
> 5 pages of medical slips (Restrictions)
> <u>5 pages dental records</u>
>
> Total: 36 pages

It is difficult to comprehend only 35+1, or 36 pages of documents
exists in my medical file considering the lengthy period I have been in jail.
Furthermore, the military medical records of injuries I sustained in combat military
service also disappeared.

Moreover, the medical department has intentionally, willfully and knowingly
falsified my medical records on at least four occasions because of their incompetency
and, upon discovering same and brought it to the appropriate staff attention, the records
disappeared. Hence, I was fortunate to receive a copy of the falsified records in February
2005 from Sottong, Medical Records Administrator. Shortly thereafter the approximately
3" file disappeared. That said, the last medical staff who had possession of the file in my
presence was Sottong when I received the documents from him. Falsifying the medical
records then willfully loosing same after I discovered the entries — which was addressed
with medical staff — is a 5 U.S.C. § 552a Privacy Act violation. In fact, one of
the PA who made some of the false entries told me that medical and the BOP
have ways of covering up same and responding. Well, now we'll see how the
medical department and the BOP will respond and cover-up, because I have no
problem sueing the staff and agency.

Please provide me with a copy of all medical records during my
confinement from my medical records except the 36 pages provided to me on
9/27/06. Failure to provide same will be considered a Privacy Act violation in
conjunction with the falsification mentioned herein — which I will litigate, if
necessary.

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and
correct.

Jacob H #10975-056

TOOLASPRASHAD, Latchmie
Reg. No. 10975-056
Remedy No. 429114-F1

---

### PART B - RESPONSE

In your Request for Administrative Remedy, you allege that the medical department has intentionally, willfully, and knowingly, falsified your medical records on at least four occasions and lost some of your medical records. As relief, you request to have a copy of all medical records during your confinement.

Your medical records cover the time period of July 16, 1986 to December 26, 1996 and January 12, 2005 to October 30, 2006. It appears part of your records have been misplaced. This occasionally happens even in the community. Efforts are being made to locate the rest of your medical records. You will be charged for copies of your medical records requested. Once this fee is collected, your records will be copied and you will be placed on call-out to receive the records.

As for your allegations of the Health Services Department falsifying documents in your medical records, you have provided no documentation supporting these allegations. Accordingly, your Request for Administrative Remedy is partially granted.

If you are dissatisfied with this response, you may appeal to the Northeast Regional Director, Federal Bureau of Prisons. Your appeal must be received in the Northeast Regional Office, U.S. Customs House, 2nd and Chestnut Streets, Philadelphia, PA 19106, within 20 calendar days of the date of this response.

_____                    11-13-06
Charles E. Samuels, Jr.                     Date
Warden

## Florida prisons

# Trouble in Tallahassee

THE ECONOMIST
TAMPA    7/8/06    P 29

A shootout at a federal prison reveals a rotten penal system

AT 7.30am on June 21st, federal agents showed up at the Federal Correctional Institution in Tallahassee, in Florida. They had come to arrest six prison guards on charges of having sex with female inmates in exchange for contraband. What followed was worthy of a Jimmy Cagney film. Ralph Hill, one of the guards who was to be arrested, began shooting at the agents. In the crossfire Hill was killed, as was William Sentner, one of the agents.

The gun battle was so fast and furious that it was unclear how many bullets were fired, or who killed whom. A team of FBI crime-scene agents was sent immediately from Washington to Tallahassee, and is still investigating. Three of the five guards remain in custody.

As Governor Jeb Bush admitted, rather ruefully, Florida does not need trouble in its federal prisons. It has plenty of problems with its own Department of Corrections. Florida prisons are a little like remote



**Damage all round**

feudal villages, where wardens and guards are the lords and the prisoners serfs. Once the prisons get the money they want from the state legislature—and in Florida it is seldom denied—they are mostly left alone to go about their business.

What that business sometimes consists of was revealed by the death of Martin Lee Anderson, a 14-year-old black who was sent to a rural "boot camp" in Bay County when he violated his probation by going for a joyride in his grandmother's Jeep. At the camp, which is run along military lines (with guards yelling in inmates' faces in order to shame or motivate them), the boy was forced to go on a run in January this year. When he said he couldn't finish, six guards began beating him. All this was recorded on a video that was released to the media in February, after the *Miami Herald* had sued to obtain it.

During the investigation of Anderson's death, a batch of e-mails from Guy Tunnell, then chief of the Florida Department of Law Enforcement, were also made public. Mr Tunnell had set up the boot camp where Anderson died. When the Florida Senate Criminal Justice Committee officially requested the videotape of Anderson's death, Mr Tunnell sent his staff an e-mail declaring "Ain't gonna happen!" He resigned shortly afterwards.

In April, students from colleges in and around Tallahassee staged a sit-in outside Mr Bush's office to protest against Anderson's death. By the end of May, the legislature had passed and Mr Bush had signed the Martin Lee Anderson Act, which replaces the camps with education-based juvenile detention centres.

Mr Tunnell was not the only official to leave the prison service under a cloud. James Crosby, the former head of the Florida Department of Corrections (FDC), also resigned in February. Mr Crosby, who was in charge of 59 state-run prisons with around 89,000 inmates (plus another 70 or so smaller detention places), had become the subject of federal and state investigations alleging that he misappropriated state funds and property and was involved in steroid trafficking.

To clean up the mess, Mr Bush hired James McDonough as the new FDC head and gave him a free hand. In his first weeks on the job, several state prison administrators were fired. "We need a professional, ethical situation around here," said Mr McDonough, laying out three goals: lower recidivism rates, improved vocational training for prisoners and better training for guards. He also plans to ask the powers-that-be for an increase in the FDC's budget after the November elections.

The federal prisons, however, remain a headache that is harder to deal with. And uncomfortably close: the gunfire battle in June took place only three miles east of the state capitol. ∎

EXHIBIT 2

Name: Latchmie Toolasprashad
Registration Number: 10975-056
Date of Birth: September 7, 1973

3

with hopes that she would marry him. After discovering his deception, the victim discontinued the relationship and allegedly disclosed to friends and military personnel that she was "afraid" of Mr. Toolasprashad. Prior to this non-judicial action by the military court, Mr. Toolasprashad had served in the military for 4 years and received numerous commendations for his work ethic and job performance. He reported receiving training in a variety of areas and being familiar with several types of firearms.

Over the course of the past fifteen years as a federal prisoner, Mr. Toolasprashad has received superior ratings from his supervisors and recommendations for superior programming, additional good time and parole. He has worked as a volunteer, taught classes and saved the lives of two inmates. In terms of disciplinary actions, Mr. Toolasprashad received four disciplinary actions for refusing to obey an order, being insolent to staff (2) and lying or falsifying statements.

Behavioral Observations

Mr. Toolasprashad was cooperative throughout the evaluation. He voluntarily submitted documentation of his work evaluations, certificates of completed training and accommodations received while in the Army and the Bureau of Prisons. During the course of the evaluation period, he insisted that his evaluation should be a priority of the psychology department. In one instance, he presented paperwork suggesting his evaluation needed to be completed prior to a trial date scheduled for July 6, 2000. Upon examination of the documents, it was determined that the scheduled court date was for a matter entirely unrelated to this evaluation.

According to information received from the Unit team at FCI Petersburg, Mr. Toolasprashad verbally confronted members of his Unit team and threatened to file a complaint because the team did not have all of the documentation he deemed necessary, in his Bureau of Prison (BOP) file. According to his Case Manager, Mr. Toolasprashad questioned her understanding of BOP policy regarding being seen by his unit team. Mr. Toolasprashad insisted that he was not required to meet with team members as a matter of policy.

Mr. Toolasprashad appeared to put forth good effort and demonstrated good frustration tolerance on all tasks. He was self critical when he failed to perform at his expected level and often verbalized excuses for not performing well such as "I am tired"; " I did not sleep well last night"; and "I did not expect this type of test in my evaluation" He did not perform well on timed tasks and approached most tasks at a slow and deliberate pace. His self criticism continued in spite of repeated reassurances from the examiner.

Mental Status

Mr. Toolasprashad arrived on time for all of his scheduled appointments. He was dressed and groomed appropriately. He was oriented to time and place, communicated in a logical and coherent manner and did not appear to be responding to any internal stimuli. His mood was neither significantly elevated or depressed. He denied any thoughts of harming himself or another individual.

EXHIBIT 3

Name: Latchmie Toolasprashad
Registration Number: 10975-056
Date of Birth: September 7, ~~1973~~
                              1963

4

Test Results

On a commonly used test of intellectual functioning, Mr. Toolasprashad performed at a level suggestive of low average intellectual functioning. His overall intelligence quotient was 82. His verbal intelligence quotient was 87 and his performance intelligence quotient was 79. The difference between his verbal and performance levels is not significant. Mr. Toolasprashad's performance on this intelligence test was consistent with previous intellectual testing on forensic evaluations completed in May and October of 1986.

Mr. Toolasprashad's performance on the verbal subtests suggests that understanding and identifying the relation between verbally presented objects and behaviors is an area of relative weakness for him. In regards to his scores on the performance subtests, his ability to recognize similarities between visually presented stimuli is an area of relative strength for him. Given his level of education and work experiences, it appears as if Mr. Toolasprashad has worked hard to compensate for his intellectual deficits and is able to communicate and present himself in a manner suggestive of a higher level of intellectual functioning.

Mr. Toolasprashad's performance on a neurological screening did not indicate the presence of any organic impairments. His performance on the memory portion of the test was at the lower end of the average range.

Mr. Toolasprashad's performance on an objective measure of personality is thought to accurately reflect his personality functioning and is not suggestive of any form of significant psychological impairment. His profile suggests he has a tendency to minimize any form of mental distress, is likely to manifest mental distress in the form of physical complaints and to present himself in a favorable manner. Given the nature and the importance of this evaluation, this type of presentation is not unusual and is consistent with his behaviors since his incarceration. For example, Mr. Toolasprashad voluntarily submitted copies of documents he deemed important to be included in the report, he was complimentary towards the examiner and the psychology department and sought volunteer employment opportunities at FCI Petersburg.

Individuals whom obtain personality profiles similar to Mr. Toolasprashad's are generally described as egocentric and narcissistic. These individuals typically resort to indirect and devious means to gain attention and affection, do not express resentment or hostility directly and are superficial and lack maturity in interpersonal and romantic relationships. These individuals are also described varied interests and may find enjoyment in non-traditional employment and recreational activities

Consistent with the objective personality testing, his performance on projective testing does not suggest the presence of any psychotic or significant mental health problems. His projective themes centered around feelings of self blame, regret, responsibility and the importance of family. His responses were not unusual given the circumstances and the importance of this evaluation to him

Name: Latchmie Toolasprashad                                                        5
Registration Number: 10975-056
Date of Birth: September 7, 1973

## Diagnostic Impression
Based on the information gathered during the course of this evaluation and the diagnostic criteria set forth in the Diagnostic and Statistical Manual-Fourth Edition, Mr. Toolasprashad received the following diagnosis:

Axis I:         No Diagnosis
Axis II:        Narcissistic Personality Disorder
Axis III:       None

## Prognosis
Individuals with a diagnosis of Narcissistic Personality Disorder, are typically sensitive to criticism, defeat or rejection and display grandiose behaviors. The feelings associated with criticism, defeat and rejection are generally referred to as narcissistic injuries. They tend to react with disdain, rage or defiant counterattack. These experiences either lead to social isolation or a mask of humility which may mask and protect the grandiosity. Interpersonal relations are typically impaired due to problems derived from entitlement, the need for admiration and the relative disregard for the sensitivities of others. Long term feelings of shame or humiliation and the attendant self-criticism may be associated with social withdrawal and/or depression. Personality disorders are long term, enduring, characterological deficits in functioning that are present in a variety of context and whose onset can be traced to adolescence. Individuals diagnosed with a personality disorder generally have an unpredictive outcome. For example, these individuals generally experience difficulties maintaining employment and establishing and maintaining relationships.

## Assessment of Dangerousness
It is difficult to predict future dangerous behaviors. However, the best predictor of future dangerous behavior is previous dangerous behavior. An assessment of dangerousness or risk should include an evaluation of the individual's propensity to commit future acts that would endanger the public and/or themselves. Among the factors most salient to a reoccurrence of an individuals past behaviors which place him at a greater risk of dangerousness are demographic factors, past acts of aggression, serious mental illness, denial or lack of insight into the mental illness, psychopathy, substance abuse, use of a weapon and lack of compliance with medication/treatment.

Among the factors that suggest Mr. Toolasprashad is least likely to present as a danger to the public or to himself is his age, ethnicity, lack of past physically aggressive behaviors, lack of serious mental illness diagnoses, lack of the previous use of a weapon and his behaviors while incarcerated. All of these factors have been associated with a low risk for dangerous behaviors. Individuals within certain age and ethnic groups are least likely to present as dangerous to themselves or society. Mr. Toolasprashad is in his mid 30's and is of Asian-Indian descent. Both of these factors place him within a group of individuals who are least likely to engage in dangerous behaviors.

Mr. Toolasprashad's personality profile presents the greatest area of concern in terms of future dangerous behavior. He initially presents as helpful, engaging, eager to please and trustworthy. He attempts to establish relationships with people whom he perceives as being on a level similar to his

Name: Latchmie Toolasprashad
Registration Number: 10975-056
Date of Birth: September 7, 1973

own and who can appreciate his unique talents and abilities. He may expend a great deal of time and energy in developing these relationships and may put forth similar efforts to maintain these relationships. His initial presentation will be consistent until he feels that his efforts are unappreciated or that the recipient of his efforts is critical or no longer worthy of his effort. At this time, Mr. Toolasprashad may exhibit a haughtiness or arrogance not previously seen which will be the result of an actual or perceived slight, rejection or criticism. His manner of responding to the actual or perceived slight, criticism or rejection will be to either internalize or externalize the emotional pain. If the slight, rejection or criticism is internalized, he may present as depressed or anxious. If the slight, rejection or criticism is externalized, the likelihood of future dangerous behavior increases. It is important to note, that the probability of Mr. Toolasprashad being the perpetrator of any behavior likely to harm another is minimal. His involvement may be limited to the planning and design of the act with another individual actually executing the plan.

Summary and Recommendations

Mr. Toolasprashad is a 36 year old man convicted of Aiding and Abetting in a Murder. He has not presented as a problem inmate over the course of the past 15 years and has programmed well. Of all the factors associated with an increased risk of future dangerousness, it is his diagnosis of Narcissistic Personality Disorder that presents with the most concern. The tendency of individuals diagnosed with this type of personality disorder to indirectly respond to being slighted or rejected in sometimes inappropriate means is a concern.

All things considered, Mr. Toolasprashad is not believed to personally be at great risk of future dangerousness. He is most likely to respond in non-lethal means and if the situation calls for further responses, he is likely to enlist the help of another in order to initiate more lethal responses. He will enlist the help of an additional individual to keep himself from engaging in behaviors deemed "below" someone of his capacity.

Irrespective of whether Mr. Toolasprashad receives parole, it is highly recommended that he participate in some form of anger management and assertiveness skill training. Participation in these programs may help him to directly express his frustration and anger in a more socially acceptable manner and may help to lessen the likelihood of future dangerousness to himself and to others.

Kendra L. Pugh, Psy.D.
Clinical Psychologist

Jamie D. Berry, Ph.D.
Psychology Intern

Psychological Evaluation
Federal Correctional Institution-Petersburg
Petersburg, Virginia

Name: Latchmie Toolasprashad
Registration Number: 10975-056
Date of Birth: September 7, 1963

Marital Status: Single
Gender: Male
Dates of Evaluation: June 23 .
through July 11, 2000

Purpose of the Evaluation
The Parole Board requested a psychological evaluation for Mr. Toolasprashad's parole hearing.

Assessment Instruments and Evaluative Procedures
Clinical Interview
Wechsler Adult Intelligence Scale-Third Edition
Incomplete Sentences Blank
Bender Visual Motor Gestalt Test
Presentence Investigation Report

Background Information
Mr. Toolasprashad is a 36 year old male of Asian-Indian descent. He is currently serving a life sentence for Aiding and Abetting in a Murder. He is originally from Guayana, South America and is the fifth born of six children. At the age of 14, he and has family moved to the United States where he eventually graduated from high school and joined the military in 1981. While incarcerated, Mr. Toolasprashad completed the requirements for a Bachelor of Science degree which he obtained from Park College in Parksville, Missouri in 1993.

Mr. Toolasprashad denied a family history of mental illness, physical or sexual abuse, violence or substance use. Mr. Toolasprashad also denied a history of substance abuse or use. His self report, however, contradicts information presented in the Pre-Sentence Investigation (PSI) report. According to the PSI, Mr. Toolasprashad reported drinking excessively while stationed in Europe in 1992 and he also reported using cocaine on at least one occasion. According to a United States Government Memorandum dated March 1, 2000, Mr. Toolasprashad reported a history of problem alcohol use on an application for a residential drug program dated September 10, 1998.

In terms of mental health history, Mr. Toolasprashad received a competency evaluation from FCI Butner in April, 1986 and a competency and sanity evaluation from FMC Rochester in October, 1986. While being evaluated at FCI Butner, Mr. Toolasprashad reported feelings of sadness, difficulty sleeping, weight loss and poor appetite. He was prescribed Sinequan and Elavil, both anti-depressant medications. During this evaluation period, Mr. Toolasprashad also reported auditory and visual hallucinations instructing him to isolate and kill himself. He attempted suicide by overdose of anti-depressant medications on April 6, 1986. At the conclusion of the evaluation period, it was determined that Mr. Toolasprashad was unable to adequately assist in his own defense and was found incompetent to stand trial. His diagnoses were Probable Paranoia, rule out Schizophrenia, Paranoid type and a Compulsive Personality Disorder.

*EXHIBIT 3*

2

Name: Latchmie Toolasprashad
Registration Number: 10975-056
Date of Birth: September 7, 1973

On July 3, 1986, Mr. Toolasprashad was admitted to FMC Rochester for a competency and sanity evaluation. At some point during his evaluation, Mr. Toolasprashad was placed under continuous suicide watch after large doses of medication were confiscated from his possession. At that time, Mr. Toolasprashad was described as a "chronic suicide risk" given his recent attempt at FCI Butner and his self-report and unverified multiple suicide attempts in the past. During this evaluation period, it was deemed that Mr. Toolasprashad was attempting to be deceptive in his report of auditory and visual hallucinations and possibly his self-report of depression. Mr. Toolasprashad was prescribed anti-psychotic medications which did not result in a decrease in his reported hallucinations. In addition, a medical examination revealed that Mr. Toolasprashad had gained weight during a period of time when he claimed to be too depressed to eat and had not eaten in 4 days. At the conclusion of his evaluation period at FMC Rochester, Mr. Toolasprashad was deemed competent to stand trial, sane at the time of his alleged offense and sane at the time of the evaluation. His diagnosis was Mixed Personality Disorder with Narcissistic and Antisocial features.

Mr. Toolasprashad did not have any criminal justice involvement prior to his current offense. In terms of his offense, Mr. Toolasprashad repeatedly stated during this evaluation that he accepts full responsibility for his actions, even though he acknowledged he did not commit the crime for which he is currently incarcerated. He stated that accepting responsibility for the crime will help him secure parole. In spite of Mr. Toolasprashad's verbal acknowledgment of responsibility for the crime, his version of the offense differs from the official report on several key points. For example, Mr. Toolasprashad reported that he had broken off the relationship with the victim because she was seeing other individuals while they were dating. In addition, he claims that he did not know his co-defendant prior to the offense. He reported intervening in a domestic dispute between the victim and his co-defendant after witnessing the victim being verbally and physically abused and threatened with the loss of her life. Mr. Toolasprashad further alleges that he was threatened with bodily harm by his co-defendant if he continued to intervene in their domestic dispute.

According to the official report, Mr. Toolasprashad was introduced to his co-defendant at a party held by mutual friends. Mr. Toolasprashad was angry with the victim because she had repeatedly rejected his proposals for marriage and her decision not to be romantically involved with him. On the next day, Mr. Toolasprashad approached his co-defendant with the idea of killing the victim. Mr. Toolasprashad offered to pay his co-defendant $20,000 and to buy him a new car to kill the victim. On December 13, 1985, Mr. Toolasprashad, in the company of his co-defendant, purchased a shotgun, ammunition, a hacksaw and a file. On December 14, 1985, Mr. Toolasprashad went to a local automobile dealership where his co-defendant had chosen a car and contacted his bank and a family member about money. Mr. Toolasprashad gave instructions to his co-defendant on how to carry out the murder. The victim was shot with a sawed off shotgun on December 15, 1985 and died on December 16, 1985.

While in the military, Mr. Toolasprashad was charged with impersonating a Criminal Investigations Division Agent, Impersonating an Officer, Forgery, Soliciting another to Commit an Offense and Falsifying Official Documents. He received a non-judicial action which resulted in a loss of pay for two months and a reduction in military rank. He allegedly committed these acts to impress the victim