# Latchmie Toolasprashad v. BOP, et al.
## Case No. 06-1187 (ESH)

# Plaintiff's Complaint Filed in the District of Columbia and Transferred to New Jersey

# Exhibit 1

**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

APR 2 3 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

LATCHMIE TOOLASPRASHAD,
                Plaintiff,                    :        CIVIL NO. _____
                                              :
                                              :
BUREAU OF PRISONS;                            :        CASE NUMBER   1 04CV00111
U.S. PAROLE COMMISSION;                       :
DREW KERR, Psy.D., Psychologist;              :        JUDGE: Unassigned
MARCIA BARUCH, Ph.D., Chief Psychologist;     :
JAIME BERRY, Ph.D., Psychology Intern;        :        DECK TYPE: Pro se General Civil
KINDRA PUGH, Psy.D., Psychologist,            :
                Defendants                    :        DATE STAMP: 04/23/___

**RECEIVED**

PLAINTIFF'S COMPLAINT IN SUPPORT OF CLAIMS AGAINST
DEFENDANTS FOR VIOLATING THE U.S. CONSTITUTION AND
UTILIZING FALSE AND MISLEADING DOCUMENTS AND INFORMATION

JUL  2 2004

04cv 32 (__)
WILLIAM T. WALSH
CLERK

    Plaintiff respectfully files this Complaint against defendants and states

as follows:

### JURISDICTION

    This Court is vested with exclusive jurisdiction to decide this cause of

action, pursuant to 5 U.S.C. § 552a; 28 U.S.C. § 1331; 42 U.S.C. §§ 1983, 1985,

1986, 1997; 18 U.S.C. §§ 241 and 242. If plaintiff cites incorrect statutes

he respectfully requests of the Court to sua sponte apply the necessary statutes

necessary to allow this cause of action to proceed.

    Moreover, this Court has already decided cases involving "inaccurate

records" used by the Bureau of Prisons ("BOP") and Parole Commission ("Board").

### VENUE

    Venue is appropriate in the District of Columbia, as the lead defendant

is the Bureau of Prisons whose headquarters is located in Washington, DC;

defendant Parole Commission is located in Chevy Chase, MD; defendant Kerr is

a former psychologist of FCI Ft. Dix, NJ, and now at FDC Philadelphia; defendant

Baruch is chief psychologist at FCI Ft. Dix, NJ; defendant Berry was a psychology

intern at FCI Petersburg, VA; defendant Pugh is a psychologist at FCI Petersburg,

VA.

## INTRODUCTION

Plaintiff has not filed this suit to make the Parole Commission angry, as Justice Department officials do retaliate against prisoners, but the Board's interpretation of the record has been grossly misinterpreted and mischaracterized and wrong.

Moreover, the Board's spin is that all psychological ailments and problems is chronic and that no time and therapy could benefit anyone and in this case plaintiff. This is not so and the record shall show that plaintiff is well suited for parole.

The Board has failed to properly review the record or consider Dr. Daniel Schwartz's report, (exhibit 8), prepared one year after defendants Berry and Pugh's report.

Through this litigation plaintiff will provide Parole Notice-of-Action (NOA) of others who have been paroled with severe mental disorder and did not encounter an iota of what plaintiff has been experiencing with the Parole Board.

## COMPLAINT

### DEFENDANTS FAILED TO TIMELY PREPARE A PSYCHOLOGICAL REPORT FOR THE PAROLE COMMISSION WITH A MAY 1, 1999 "INITIAL" DUE DATE WHICH EFFECTIVELY PREJUDICED PLAINTIFF FROM GAINING PAROLE

1.   On November 2, 1998, plaintiff appeared before the Parole Board at which time a psychological report was ordered and the BOP was to have same to the Board by May 1, 1999. (Exhibit 1).

2.   Unfortunately, the report wasn't written, though defendant Drew Kerr ("Kerr"), Psy.D., a psychologist at FCI Ft. Dix, NJ, assured plaintiff he was writing the report when in fact he wasn't. In fact, plaintiff met with Kerr on numerous occasions and Kerr only kept asking questions about plaintiff's child-hood days. Moreover, plaintiff became Kerr's personal plaything and he

deceived plaintiff, plaintiff's family, and prison guards who intervened, when in fact, he wasn't writing the report or doing anything.

3.    As the report wasn't furnished by the May 1, 1999, date plaintiff was denied parole, as the Board misinterpreted and mischaracterized the record, and subsequently denied parole and set a new date for the report — November, 2000. (Exhibit 2).

4.    From November, 1998, and up to June, 2000, or 19 months plaintiff repeatedly begged and plead with Kerr; and, guards who also knew plaintiff intervened to have the report completed and submitted to the Board, all to no avail.

5.    Kerr repeatedly informed plaintiff and his parents that he was writing the report and would have same submitted by the May 1, 1999 date; however, he wasn't being truthful.

6.    Plaintiff even went to Kerr's superior defendant Baruch, Chief Psychologist and "then" Warden Nancy Bailey, both of whom brushed plaintiff aside. Baruch informed plaintiff that the report was being written when in fact it wasn't, and Warden Bailey informed plaintiff, "I don't believe the Parole Commission wants the report. You want the report." Plaintiff assured Warden Bailey that the Board wanted the report and even showed Warden Bailey the Board's need for the report, (exhibit 1), and plaintiff was still brushed aside by Warden Bailey.

7.    As Kerr kept up the drive hoodwinking plaintiff, a complaint was filed with the American Psychological Association (APA), and New Jersey Psychological Association in an effort to get the report written since Kerr wasn't doing anything. (Exhibit 3).Plaintiff was referred to other professional organizations but Kerr was not a member of any professional organizations.

3

8.    To show the arduous task plaintiff went through to get the prison administration help to have the report written a listing of requests detailing plaintiff's plight are as follows in "ascending" order:

- Request to Warden Bailey dated October 10, 2000, expressing concern about the report, and that other staff members had been supportive and helpful but not Kerr. No Response.
- Request to Warden Bailey dated April 3, 2000, expressing concern about the report and how other staff members had been supportive and helpful but not Kerr. No Response.
- Detailed request to Associate Warden Alexander dated March 20, 2000. Hand Delivered to Alexander in front the gym.  No Response. However, about a week later Alexander saw plaintiff walking behind the gym, as plaintiff has to walk by this area to go and come from work, and told plaintiff she ordered that plaintiff request be sealed.
- Request to Kerr dated January 6, 2000. Hand Delivered. No Response.
- Request to Baruch dated December 10, 1999, in which plaintiff requested to review the report that Kerr repeatedly claimed to have written for the Board. Hand Delivered. No Response.
- Request to Kerr dated July 25, 1999, informing Kerr that plaintiff was denied parole as the report he claimed to have submitted was never received by the Board. Hand Delivered.  No Response.
- Request to Kerr dated October 28, 1999.  Hand Delivered. No Response.
- Detailed request to Warden Art Beeler dated October 2, 1999, expressing concern that plaintiff has been very patient and the action of Kerr. Hand Delivered. No Response.
- Request to Kerr dated October 25, 1999, expressing concern about the report.  Hand Delivered.  Kerr responded October 26, 1999, by stated,

> "Mr. Toolasprashad ———
>
> I know  you have many questions and concerns related to this evaluation; I would like to be able to talk with you about this and have asked the Chief Psychologist (Defendant Baruch) to meet with us.  I have scheduled an appointment for Tuesday morning 11-02-99 in Psychology.  I hope to see you there."

It should be noted that plaintiff showed up for the appointment but Kerr never showed and no meeting ever occurred. Moreover, it should be noted that this no-go appointment was scheduled after six months of the due date, or one year since the report was ordered.

- Request to Kerr dated October 9, 1999. Hand Delivered. No Response.
- Request to Kerr dated October 9, 1999 re release of information. Hand Delivered. No Response.

- Request to Kerr dated August 26, 1999. Hand Delivered. No Response.
- Request to Kerr dated February 7, 1999. Hand Delivered with a copy of plaintiff's prison record, community record, military record, and other documents. No Response.

9. After the November, 1998, parole hearing plaintiff spoke with Kerr in November and December, 1998 and, again, in January, 1999, before plaintiff began submitting written requests.

10. The Court needs not expand its imagination to see plaintiff has done everything possible that a prisoner could do to get Kerr to write the report - and plaintiff's pleas and cries went in vain.

11. On countless occasions plaintiff went to the psychology department and pleaded with Kerr to submit to the Board the report he claimed to have written - all to no avail. Plaintiff also sought the help and assistance of Baruch and, in fact, even spoke with a Dr. Elizabeth Scott.[1]

---

[1]

Dr. Scott resigned from the BOP late-2000, as she had no interest in the department because the inmate that she was having a sexual relationship with had left the prison during summer 1999 and she was in the middle of making plans with him for her resignation from the BOP and marriage to the inmate. In fact, Scott had assisted the inmate in obtaining college credit instructions via the psychology department in violation of BOP policies as she surreptitiously circumvented the education department (Scott even falsified documents in the psychology department in order to aid the inmate to obtain "graduate" college credits), and preparing and helping the inmate for a local Boston TV news channel coverage of his release from prison. (A copy of the video tape was available in the psychology department). The coverage of the inmate was broadcast on a Boston TV news program, and the follow-up story segment was done on a prime time TV news magazine after Scott left the department and they were married. On this segment it was revealed that they were married and Scott was expecting a baby or had a baby from the relationship. That is, her primary objective during her employment at the time before and during the plaintiff's dilemma with Kerr and the department to get the report written was solely on covering up a relationship with the inmate, a public relations promotion beneficial to her future husband and her financial means in Boston, in obtaining certification as a counselor in the State of Massachusetts for her resignation. Prior to Scott's resignation, their on-going relationship was the talk of the compound; the inmate was the clerk at FCI Ft. Dix East side prison psychology department - he was moved to FCI Ft. Dix West side from contact with Scott. Both FCI Ft. Dix East and West psychology department is under Baruch's immediate control and she knew that a felony was being committed. Obviously, Baruch who knew of the relationship didn't give two-wits about following statutory law, BOP rules, or the BOP Standards of Employee Conduct, P.S. 3420.09, except when she cares to. Moreover, on or about mid-1999, plaintiff spoke with Scott in the psychology department and she stated to plaintiff, "I am not doing the report. It is Dr. Kerr's job. I will be quitting soon, and we don't answer to the Parole Commission. Nothing I can do for you."

12. Even plaintiff's work supervisor went out of his way to assist plaintiff
in getting Kerr to write the report as on February 22, 1999, plaintiff requested
of his supervisor to prepare a Memorandum to Kerr. Said supervisor responded
on same date, February 22, 1999, and prepared a Memo dated February 25, 1999
to Kerr, detailing plaintiff's work, conduct and his observation. (Exhibit 5).

13. Defendant Kerr repeatedly deceived plaintiff, his "ill" parents, "then"
counsel, and guards who intervene on plaintiff's behalf - all to no avail -
as Kerr kept up the drive with his deceptive tactics that the report was written
and submitted, when it wasn't true.

### AFTER PLAINTIFF UTILIZED THE ADMINISTRATIVE REMEDY TO DECRY FCI FORT DIX PSYCHOLOGY DEPARTMENT DECEPTIVE TACTICS, PLAINTIFF WAS RETALIATORY TRANSFERRED TO FCI PETERSBURG, VA

14. After plaintiff's exhaustive efforts to get help from FCI Ft. Dix
psychology department based on Kerr's deceptive tactics, plaintiff was retaliatory
transferred to FCI Petersburg, Virginia, where the report was written and contained
false, misleading and retaliatory information without any basis or facts.

15. On or about June 6, 2000, about 5:00 p.m., plaintiff was clandestinely
shanghai from his housing unit at FCI Ft. Dix West Compound and taken to FCI Ft.
Dix East Compound (two different prisons with the same administration). The two
guards told plaintiff that they had no idea what was going on, and even when
plaintiff was taken to the medical department at FCI Ft. Dix East, the physician
assistant (Bokhari), who was the duty PA, told plaintiff he had no idea why plaintiff
was moved from the West Compound. Plaintiff was then locked-up in a room and the
next morning about 5:00 a.m., he was taken to the lieutenant's office (Lt.) where
he was shackled and handcuffed, along with another prisoner, taken to Trenton, NJ,
airport where he was placed on a private jet (Tail No. US 169 or 169 US) - along
with the other prisoner and three guards. Still plaintiff had absolutely no idea
what was going on or where he was being taken and for what reasons.

16.. Shortly after take-off the airplane landed somewhere in Virginia
(presumably Petersburg), where he was picked up by a lieutenant and another guard
and taken to FCI Petersburg.  On the way to the institution the lieutenant, who
knew plaintiff from many years ago, stated to plaintiff that they had no paperwork
on plaintiff, no transfer order, only that plaintiff was moved to Petersburg. (The
Lt. also stated that he was surprised to see plaintiff still in prison after several
years, and the Lt. stated to plaintiff that "Minority . inmates serve much more
time than the whites.")

17.  Upon arrival at Petersburg, Receiving and Discharge (R&D), the guards
placed plaintiff with the pre-trial prisoners.  Subsequently or within a few hours
plaintiff was moved two times within the unit before being placed on the third
floor of the hold-over unit.

18.  Plaintiff had no idea why he was at Petersburg, and began asking guards
the reasons for transfer and none knew as there was no "transfer order" in
plaintiff's file.  Not even the Unit Team knew why plaintiff was transferred until
they called FCI Ft. Dix.  Moreover, plaintiff went to the psychology department
and inquired and was told by a Dr. Ax that FCI Ft. Dix Psychology Department
requested a "forensic" evaluation for the "court" (when in fact it was a "general"
report for the Parole Board).  Then within a few days plaintiff was told by Dr. Ax
that it wasn't a forensic report, but a general report and someone else would
prepare the report.  Dr. Ax further informed plaintiff that the psychology department
at FCI Ft. Dix could have written the report without hesitation or difficulty,
which would have been more beneficial for plaintiff at Ft. Dix since the staff
personnel knew his conduct, programming, overall demeanor, etc.  Dr. Ax also stated,
"Ft. Dix should have written the report. Its a general report. Are they lazy?"

THE REPORT WRITTEN AT FCI PETERSBURG IS
INACCURATE, MISLEADING AND WITHOUT SUPPORTING FACTS

19. The report written at Petersburg dated June 23 through July 11, 2000, was supposed to "initially" submitted to the Board by May 1, 1999. Plaintiff will challenge the report in specific portions, specifically "behavioral observations," "diagnostic impression," "prognosis," "assessment of dangerousness," and "summary and recommendations." (Exhibit 6, page 3, 5 and 6).

20. At no time defendants Berry and Pugh interviewed plaintiff together, considering Berry was a psychology intern. In fact, absolutely nothing was ever explained to plaintiff by Berry or Pugh, not about the report or its purpose, or how the evaluation would be conducted. Thus during the testing of "assessment instruments" used, plaintiff had numerou questions and Berry would leave the room and when plaintiff asked questions, Berry would tell him, "Don't worry about it. Just put an answer." This was especially so when plaintiff took the MMPI II test, which doesn't even appear on the report under "Assessment Instruments and Evaluative Procedures." (Exhibit 6). The testing process were very short in time; that it, it did not take up much clock time - quite brief the least to say.

21. While plaintiff was taking the MMPI II, he had concerns regarding questions on the MMPI in which the answers would relate to a person in a "free society." Merely put when plaintiff brought-up concerns about the MMPI, Berry told him, "Don't woory about it. Just put an answer." Not once Berry looked at plaintiff's questions and offered any guidance. "Some" of the questions (and not all inclusive) plaintiff had reservation about on the MMPI are listed on the reverse side of an envelope he had with him. (Exhibit 7).

22. At page 3 of the Report Berry states,

> According to information received from the Unit team at
> FCI Petersburg, Mr. Toolasprashad verbally confronted
> members of his Unit team and threatened to file a complaint
> because the team did not have all of the documentation he
> deemed necessary, in his Bureau of Prisons (BOP) file.
> According to his case manager, Mr. Toolasprashad
> questioned her understanding of BOP policy regarding being
> seen by his Unit team. Mr. Toolasprashad insisted that he
> was not required to meet with  team members as a matter of
> policy."

(Exhibit 6, page 3).

The above statement is not only prejudicial but completely inaccurate.  The
statement indicates plaintiff confronted members of his unit team.  Plaintiff
appeared before the team (acting unit manager and case manager) once for about
five minutes and did comment about BOP policy in which the unit team was required
to give plaintiff at minimum 48 hours notice before a team appearance, BOP P.S.
5322.10; however, plaintiff was given a mere few minutes notice. A prisoner
is required by policy to follow directives, which plaintiff did by "appearing"
before the team. However, it is not against policy for a prisoner to cite BOP
policy or to speak or to call attention to the unit team matters directly related
to the purpose of which the meeting is being held.  At the team appearance
plaintiff was told by the case manager that they did not have the "transfer
order," and that Ft. Dix could have prepared the report since plaintiff's record
did not contained his program participation, or a progress report.

23. Plaintiff never indicated he would file a grievance and, even had
he done so, it is protected activity.  Moreover, he did not question the case
manager about policy; plaintiff commented that it is required for a prisoner
to be given at minimum 48 hours notice before a team appearance -- this would
allow time to gather paperwork of program participation, etc. (As plaintiff
was given a mere few minutes notice to appear before the team, in a similar
sense on October 14, 2003, plaintiff was given a mere $1\frac{1}{2}$ hours notice for a
scheduled parole hearing by his case manager in which he had to waive). Plaintiff

did not say he did not have to meet with the team. He indicated that the team should be postponed until the paperwor was received from Ft. Dix and that policy dictates that plaintiff may waive team apperance. (Team appearance is now mandatory.) This type of reporting scheme clearly prevents a prisoner from speaking - chilling speech.

24. It is worth noting that the comments as written in the report, (exhibit 6, page 3), do not suggest plaintiff was aggressive or insolent toward staff. Plaintiff has always been quite respectful to staff and inmates, the least to say, as so documented in his Progress Reports and prison file. However, policy does not place restrictions on prisoners informing guards of policy, nor is being assertive of one's statutory or constitutional rights. Nowhere in policy is a prisoner directed to be a milquetoast. Had plaintiff violated the rules or policies he would have been disciplined, and nowhere the comments could be characterized as negative.

25. Immediately following the team appearance plaintiff was marched by the case manager to the psychology department and lectured by Pugh. Because the case manager went behind closed doors with Pugh, plaintiff knows not what was said. However, Pugh informed plaintiff that he shouldn't be reading BOP policy because the BOP could do anything they wish, that she did not want to see plaintiff in the law library filing any complaints against the unit team for the violation. The law library is located in the same building on the first floor about 20-30 feet from the psychology department. In fact, Pugh went to the law library on two occasions and extracted plaintiff from what he was doing to report to her office for very brief interviews and telling plaintiff not to help other prisoners writing letters to family members, and to stay out the law library, etc. (It should be noted that plaintiff was pursuing post conviction remedies on his criminal conviction and abandoned said pleadings in fear of Pugh's orders.) This is effectively "chilling speech" suppressing

a prisoner's first amendment rights of free speech and the rights to address prison staff and the courts - first through the administrative grievance process and later through in filing motions with courts. Moreover, it is a violation of BOP policy to deny a prisoner access to the law library when that prisoner is engaged in legitimate and proper activity for which the law library is for, ie., for research and preparation of legal matters.

26. At page 5 of the report Berry diagnose plaintiff as follows:

Axis I: No Diagnosis
Axis II: Narcissistic Personality Disorder
Axis III: None

Defendant Berry's diagnosis is not only incorrect but there is no facts from the records or testing conducted by Berry to come-up with a narcissistic personality disorder. (Exhibit 6, page 3). Yet, Berry contradicted himself at page 4 ¶ 4 which states,

Mr. Toolasprashad performance on an objective measure
of personality is thought to accurately reflect his
personality functioning and is not suggestive of any
form of significant psychological impairment.

(Exhibit 6, page 3 ¶ 4).

27. In a report one year later of Berry's by a "forensic psychiatrist," Dr. Daniel Schwartz ("Schwartz"), of more than 30 years experience and testified for the government countless occasions and personally examined more than 1000 murderers, effectively contradicted Berry's report. Dr. Schwartz is a well-known forensic specialist by the government. (Exhibit 8 - see Discussion at page 3 ¶¶ 2, 3, 4, 5 and 6 - Schwartz).

28. The discussion of Berry's prognosis is materials directly out the text utilized by him to prepare this misleading report. None of the materials are personally directed at plaintiff but rather how written in the text.

11

29.  In Berry's assessment of dangerousness, he went on to discuss a testbook explanation as thus mentioned in ¶ 28 above.  Berry states at page 5 ¶ 4,

> Among other factors that suggest Mr. Toolasprashad is least likely to present as a danger to the public or to himself is his age, ethnicity, lack of past physically aggressive behaviors, lack of serious mental illness diagnoses, lack of the previous use of a weapon and his behaviors while incarcerated.  All of these factors have been associated with a low risk for dangerous behaviors. Individuals with certain age and ethnic groups are least likely to present as dangerous to themselves or society.  Mr. Toolasprashad is in his mid 30's (current age is 41 years old) and is of Asian-Indian descent.  Both of these factors place him in a group of individuals who are least likely to engage in dangerous behaviors.

The above is an accurate assessment of Berry and plaintiff agrees with him though Berry has consistently contradicted himself without facts.

30.  At page 6 ¶ 1 (before summary and recommendations) of the report, plaintiff completely disagree with Berry as there is no facts to support his claim.  However, plaintiff agrees with Berry's statement of,

> It is important to note, that the probability of Mr. Toolasprashad being the perpetrator of any behavior likely to harm another is minimal.

(Exhibit 6, page 6 ¶ 1).

31.  At page 6 ¶ 2 of the report Berry states,

> All things considered, Mr. Toolasprashad is not believed to personally be at great risk of future dangerousness.  He is most likely to respond in non-lethal means and if the situation calls for further responses, he is likely to enlist the help of another in order to initiate more lethal responses.

(Exhibit 6, page 6 ¶ 2).

Berry has once again contradicted himself and placed the comment, "He is most likely to respond in non-lethal means" is directly in "retaliation" for the case manager noted to Pugh that plaintiff would file a grievance — chilling speech — the least to say.  (See, ¶¶ 22, 23, 23 and 25 above for explanation).  This is pure retaliatory in nature and "chilling speech."  Also, it is worth noting that Berry had no facts to support his statement, "... if the situation calls for further responses, he

12

is likely to enlist the help of another to initiate more lethal responses." Rather

than basing his report on facts, Berry chose to use plaintiff's criminal conviction

that occurred almost two decades ago when he was much younger – as his case is

an aiding and abetting murder. This statement by Berry is totally without facts

or foundation and he merely used plaintiff's conviction to effectively prejudice

him rather than being fair and impartial. The statement is directly out of

plaintiff's conviction. (When plaintiff offense occurred he was much younger

and almost two decades later plaintiff is a changed person and learn from his mistakes).

    32.  At page 6 last ¶ of the report by Berry states,

            Irrespective of whether Mr. Toolasprashad receives parole,
            it is highly recommended that he participate in some form
            of anger management and assertiveness skill training.

    (Exhibit 6, page 6, last ¶).

At no time plaintiff showed any signs of anger, frustration, etc. However, plaintiff

was quite tired and sleep-depraved as he was placed in a cell with a total of

six prisoners that contained approximately 30 square feet (measured) of moving

space in the cell (this includes corners between the bunks), with temperatures

reaching over 100-110 degrees fahrenheit (as so stated by staff), and extremely

noisy as the unit had bars – not doors. In fact, there was no chairs in the unit

to sit and plaintiff had to literally sit on the dirty floors whenever he had

to do any writing or needed to get off his feet; when plaintiff asked staff about

the chairs he was told that the unit does not allow chairs. Moreover, during

the nights big dark roaches would be crawling on top of plaintiff and on his face

waking him up, coupled with loud noise and snoring. Indeed plaintiff was extremely

tired from the environment/condition to include being around much younger prisoners

who were constantly making loud noise. Thus during the few short-timed tests

indeed plaintiff was extremely tired and sleep-depraved. Plaintiff has drawn

a diagram on August 13, 2000, of the cell showing the space. In fact, during the

prison 4:00 p.m. stand-up count when plaintiff and the other five prisoners were

standing the guards even had problems seeing the shorter-in-height prisoner and plaintiff was the shortest. (Exhibit 9). Shortly before plaintiff's transfer back from Petersburg two of the beds were removed from the cell. In fact, plaintiff and other prisoners spoke with the psychology guards about the deplorable living-condition, and plaintiff clearly understand that harsh environment is part of prison life, nonetheless, the court did not impose a sentence of torture.

33. Even complying with the inaccurate report most stringent recommendations of anger management and assertiveness skill training, (see, ¶ 32 above), plaintiff by far surpassed said recommendations and repeatedly commended by guards of his exceptional conduct, programming and rehabilitative efforts to better himself, as he completed the following:

- Alternative to Violence (AVP) basic course, AVP advanced course, and served as a faciliator for the program. This is a project by the Quakers with civilian volunteers who comes to the institution. Each course is a 4-day workshop from 8:00 a.m. and up to 3:45 p.m. with a 45 minute lunch break. April/May 2001. (Exhibit 10).

- Men's Issues, December 12, 2000, then became the facilitator for more than two years. (Exhibit 11).

- Anger Management, January 30, 2001, then became the faciliator for more than one year. (Exhibit 12).

- Mentoring Program, April 10, 2000, then became the faciliator for more than two years. (Exhibit 13).

- BOP 500-hours Residential Drug Abuse Program (RDAP), November 15, 2002. Plaintiff was considered a pivotal cog in his class by his fellow prisoners to ensure everyone supported each other to better themselves, which was recognized by the RDAP staff. On October 22, 2003, plaintiff completed the Non-Residential Transitional Services program relating directly with the RDAP 500-hours program. And, plaintiff has been repeatedly commended by the RDAP staff for helping out the RDAP programs, and even assisted with instructing the Yoga class for the RDAP. It should be noted that the RDAP is the only program within the BOP that is Congressional mandated for a 12 months sentence reduction and six additional months halfway house upon successfully completed the RDAP. (Exhibit 14).

At the time Berry wrote the report, plaintiff's file did not contained the above documents of programs completed. Thus some of the programs have been completed

14

after the report was written.  Moreover, the Court can see plaintiff went far
beyond the recommendations of Berry's report to better himself, and the prison
does not have any other programs to offer him.

34.  It is important to note that at no time plaintiff's offense was discussed
with Berry or Pugh and Berry made his assessment by reading the government's records;
not once Berry or Pugh discussed any testing process or even the report to plaintiff.

35.  On September 8, 2000, plaintiff requested from Case Manager Alderman, who
was the same guard that prevented plaintiff from speaking, for a copy of the report
prepared by Berry and Pugh.  On September 12, 2000, Alderman responded,

> The Unit Team does not get a copy of psychological reports.
> Please address this concern with the psychology department.

(Exhibit 15).

36.  Plaintiff went to the psychology department asking Berry for a copy of
the report, after Alderman informed that the unit team "does not get a copy of
pyschological reports," at which time Berry stated to plaintiff,

> The report supports you for parole.  I hope you
> get out.

Berry further informed plaintiff that he could not release the report and would have
to get a copy from Ft. Dix Psychology Department.  Plaintiff then asked Berry how is
he (plaintiff) to challenge any portions of the report if not accurate and Berry
informed plaintiff,

> This report is excellent.  Don't worry. You'll be
> okay at the Parole Board.

37.  When plaintiff arrived at Ft. Dix and tried to get a copy of the report
from his unit team, he was informed that the report was not in his prison file. On
September 25, 2000, plaintiff hand-delivered a request to the psychology secretary.
(who is now a case manager), (Exhibit 16), addressed to defendant Baruch, requesting
a copy of the report.  After several attempts to obtain the report, on October 22,
2000, plaintiff was given a copy of the report by Baruch, (exhibit 6), at which time
Baruch stated,

Its a good report in your favor. No problem getting
parole with this report. Good luck!

## DEFENDANTS BERRY AND PUGH'S REPORT WAS EFFECTIVELY CONTRADICTED ONE YEAR LATER BY A LEADING FORENSIC PSYCHIATRIST RECOGNIZED BY THE GOVERNMENT OF MORE THAN 30 YEARS

38. Upon completion of the report by Berry and Pugh, plaintiff's family retained

"then" counsel in order to assist with the parole hearing and a report by Dr. Daniel

Schwartz, a professor of forensic psychiatry. Through plaintiff's former counsel

arrangements had been made for Dr. Schwartz to visit with plaintiff on November

16, 2000, to prepare a report. While the visit was approved for November 16, 2000,

the evening of November 15, 2000 (about 6:45 p.m.), a guard by the name of Walt

Jones called former counsel and denied said visit for Dr. Schwartz without cause,

when the same type of visit for other prisoners had been approved (plaintiff will

provide documentation through this litigation). BOP Policy 5267.06 also provides

this visit to allow for parole preparation. The very next day, November 16, 2000

former counsel sent off a letter by overnite mail to Warden Bailey who never responded.

On May 21, 2001, another letter was sent to Warden Bailey and former counsel stated,

I have spoken to numerous people at your facility, received
conflicting information, and still, after months, have not
been advised as to whether Dr. Schwartz's visit is approved.

Finally by letter of June 27, 2001, former counsel faxed a letter to Warden Bailey

stating at page 2,

If permission is not granted, I will seek permission from
the Federal Court.

(Exhibit 17).

After the June 27, 2001 letter, the visit was approved and arrangements for Dr.

Schwartz to prepare a report. (Plaintiff's unit team was supportive in assisting

him to get paroled and done everything to get Dr. Schwartz approved).

39. Plaintiff was to appear at the Board November 2000, but because the staff

were not responding to "then" counsel's letters, plaintiff did not get before the

Board until August 2001, in which Dr. Schwartz appeared and presented his facts

that plaintiff should be paroled — Dr. Schwartz's testimony was ignored — though a forensic psychiatrist who examined more than 1000 murderers.

40.  Dr. Schwartz, a Retired Professor of Psychiatry, State University of New York Health Science Center at Brooklyn; and, Director, Forensic Psychiatry, Kings County Hospital Center, and well recognized by the government, at pages 2, 3 and 4, states in pertinent parts of his report which was ignored.  Dr. Schwartz also appeared at the Board with an excellent presentation; Dr. Schwartz's report was also ignored which states,

> In 1983 he saw action in Grenada, caring for the wounded amidst the death of 19 American soldiers.  He had a particularly vivid memory of seeing the body of an infantryman who had been cut to pieces in a helicopter crash.  The next year he reenlisted and was involved in covert action in Central America, an experience that he describes as "very scary."  In March 1985, a fiery helicopter (Black Hawk) crash at Ft. Bragg took the lives of all 11 men; almost all the bodies were severely burned, and the two pilots had been very close friends.[2]

> Mr. Toolasprashad may well have suffered a Posttraumatic Stress Disorder, feeling "torn to pieces" at the time and experiencing subsequent nightmares of this aircraft and the bodies burning.  Reportedly, the Army psychiatrist from whom he sought help dismissed him, telling him that he should be able to handle it himself.

> MENTAL STATUS:  On examination Mr. Toolasprashad shows no indication of psychosis or even mental illness.  He is fully alert and quite cooperative.  He is a good historian, with no evidence of organic mental illness.  His statement are always responsive, coherent and relevant, with no suggestion of delusion, hallucinations or otherwise disordered thinking.  He is initially resentful of the fact that it has taken ten months for this examination to be allowed, but once he has ventilated such understandable feelings his mood is best described as neutral.  His display of feelings is of normal intensity and always appropriate.

---

2

  Plaintiff was assigned with the Army's largest and only Airborne Combat Aviation unit, and was the only soldier from the medical section assigned to work along with the crash investigation team from the Armed Forces Institute of Pathology, Washington, DC, and the Army Aviation Center, Ft. Rucker, AL.

In regard to the present offense, he makes it perfectly clear
that he feels responsible for what happened.  No discussion
of the facts leading up to the crime relieves him of any
responsibility.

**DIAGNOSIS:**    No Mental Illness
                 No Personality Disorder
                 No Physical Disorder

**RECOMMENDATION:**  It is respectfully recommended to the Court
that, from a psychiatric point of view, it would be most
appropriate to release Mr. Toolasprashad on parole.


**DISCUSSION:**  For over 26 years I was the director of a forensic
psychiatry service that examined thousands of criminal defendants
a year.  As such I myself have probably seen over a thousand
murderers, and have necessarily had to pass judgment as to their
dangerousness.  I have often rendered pre-sentence recommendations,
and have also examined many psychiatric patients who have been
found not responsible because of mental illness (NGRI) as to
possible release; in both cases, the most important question is
their dangerousness.

There is nothing in my examination (or that of Dr. Berry's a year
ago) that suggests any risk to the community.  There are no
paranoid, grandiose or vengeful thoughts or feelings.  What
happened in this case was between two people, and there is no
indication that Mr. Toolasprashad represents a danger to anyone
else on Earth.

(With all due respect to Dr. Berry's diagnosis of Narcissistic
Personality Disorder, the findings he reports on the
psychological tests he administered do not seem consistent with a
personality disorder.  Such a problem, by definition, 'leads to
clinically significant distress or impairment in social,
occupational, or other important areas of functioning,'
[Diagnostic and Statistical Manual - Fourth Edition, p. 633.]
and the prison records shows just the opposite.  Dr. Berry
himself writes that Mr. Toolasprashad's test performance 'is not
suggestive of any form of significant psychological
impairment' [p. 4]).

Beyond my examination is the record of Mr. Toolasprashad's
behavior, both before and subsequent to the present offense.
As far as we know, there has never been another act of violence,
or even a threat of violence.  Most expert in forensic psychiatry
consider one's history, or absence, of violent behavior as the best
basis for predicting the future - and here his past performance is
exemplary.  He has been repeatedly noted to have made 'outstanding
progress' in the Federal Bureau of Prisons, to have maintained 'an
above-average rapport' with the staff, and to have been no
management problem.

> Nor is there any indication that psychiatric treatment or
> psychotherapy need be a condition of parole. If Mr.
> Toolasprashad is release from prison, he will probably
> be deported....
>
> In conclusion, there is every indication that if Mr.
> Toolasprashad is released, he will be a law-abiding, safe
> and productive member of the community.

(Exhibit 8).

41.  As is obvious both Dr. Schwartz and defendants Berry and Pugh agreed that

plaintiff is not a risk to anyone. Still, Dr. Schwartz has contradicted Berry and

Pugh in their diagnosis and in the summary and recommendation. And, still the Board

misinterpreted and mischaracterized Berry's report, using same to deny parole without

cause.

### THE PAROLE BOARD USED DEFENDANTS BERRY AND PUGH'S
### INACCURATE AND MISLEADING REPORT TO DENY PLAINTIFF PAROLE

42.  On November 2, 1998, plaintiff appeared at the Board and a psychological

report was to be prepared by the BOP and submitted by May 1, 1999, (exhibit 1),

which the BOP failed to do.

43.  Subsequently, plaintiff was denied parole and the Board changed from the

May 1, 1999 due date of the report to on or before November 2000 at the next hearing.

(Exhibit 2 at page 2). Also, the Board used old psychological reports that was

more than 12 years old to deny parole. Additionally, the Board stated plaintiff

did not accept responsibility for his offense, at the initial hearing, which is

not only incorrect and misleading – as plaintiff consistently took responsibility

for his offense and well documented by BOP staff – which will be furnish through

this litigation. Thus the Board had misinterpreted the argument at the initial

hearing by "then" counsel — who was a former BOP case manager. Moreover, while

plaintiff and others were waiting to be seen in the visiting room at FCI Allenwood

for the 1995 hearing, the Examiner (Essig) was talking with plaintiff and others

and he stated, "You guys are not getting parole. The Commission is going out soon

and we have to keep you guys to keep our jobs." Hearing this plaintiff was not only afraid but scared to even speak since the decision was already pre-decided. At the initial hearing, plaintiff took responsibility for his offense, though he said very little, as he was gravely afraid of the Examiner.

44. An appeal was taken and plaintiff was denied parole as the Board completely misinterpreted and mischaracterized the record. The denial states in part,

> Although you now argue that you are a good parole risk
> without any mental problems that would cause you to
> commit more violent crimes, and that you have taken
> responsibility for your original offense, the
> psychological report from FCI Petersburg dated July
> 1, 2001 (correct date should be 2000) given a careful
> reading, contradicts the claims.

(Exhibit 18).

45. The report by Berry and Pugh is contradictory in itself, and not once the Board even mentioned Dr. Schwartz's report and live testimony at the hearing in August 2001, which shows that the Board is selective in what they wish to address and never reviewed the records or audio tapes. In fact, at the hearing the Examiner did not even possess Dr. Schwartz or Berry's reports, or the numerous Superior Program Achievement documents, program participation/completion -- all of which were provided to the Parole Board.

46. The Board is with autonomous status power and completely mischaracterized and misinterpreted the report, just finding anything to deny parole. The Parole Board spin is that all psychological ailments are chronic and that no time and therapy could benefit anyone and in this case the plaintiff. (Through this litigation plaintiff will provide Parole NOA of other prisoners who have been paroled with severe mental disorder and did not encounter an iota of what plaintiff has been experiencing with the Parole Board).

20

DEFENDANT BARUCH'S COMMENTS REGARDING THE REPORT PREPARED BY
DEFENDANTS BERRY AND PUGH EFFECTIVELY SUPPORTS
PLAINTIFF'S RELEASE

47.  Plaintiff obtained a 2-page hand-written note from his prison Central
File dated 11/21/00 by John Harrington, Unit Manager, summarizing Harrington's
telephone conversation with Baruch, Chief Psychologist, concerning the psychological
report by Berry and Pugh.  In part, the note reads at page 2,

> Marcia B. (Baruch) believes the eval. was
> positive and in inmate's favor.

(Exhibit 19, page 2 - comments of chief psychologist).

48.  The Parole Board in denying plaintiff has stated that the report by Berry
and Pugh was used in determining the denial.  As noted above at ¶ 47, the assertion
by Baruch, Chief Psychologist, according to Harrington's summary and conversation
with her, as well as with Dr. Schwartz's report.

49.  Moreover, at the bottom of page 1 of the hand-written note by Harrington's
summary states (after a conversation with plaintiff's "then" counsel),

> Bottom line - wants to supplement the BOP's psych.
> evaluation w/one done by Mr. (Dr.) Schwartz.  The
> inmate did not request this be done, his attorney did.

The statement, "The inmate did not request this be done, his attorney did" is
misleading.  Indeed plaintiff requested of his family to have a report prepared
by an independent psychologist or psychiatrist, and plaintiff had spoken with his
Unit Team, as well as, defendant Kerr about an independent report as far back as
December 1998.

PLAINTIFF HAS EXHAUSTED THE
ADMINISTRATIVE REMEDY PROCESS

50. On August 19, 2003, plaintiff submitted an Informal Resolution attempt (BP-8), (exhibit 20), and a response by Counselor Hamel dated 8-27-03, stated that defendant Baruch was contacted and plaintiff informed that he "may request another evaluation." (Exhibit 21).

51. On August 28, 2003, plaintiff submitted a Request for Administrative Remedy (BP-9), (exhibit 22). By response dated 9/16/03 and authored by C.J.DeRosa, in which the response was prepared by Baruch for DeRosa's signature, Baruch changed position for an updated report regarding the challenged portions by plaintiff. The response also states, "... if you are interested in submitting any information to the parole board regarding your overall conduct, work performance and program participation, you may request your unit team to submit any program participation records and work evaluations to the parole board." (Exhibit 23). Relief was denied. It is worth noting that these documents have been furnished to the Board and have been ignored because when plaintiff appeared before the Board the Examiner had none of the documents, not the reports prepared by Dr. Schwartz, defendants Berry and Pugh, not plaintiff's work performance, program completion/participation, nor the Superior Program Achievement (SPA) recommendations made by staff.

52. On September 20, 2003, plaintiff submitted his Regional Appeal (BP-10), (Exhibit 24), and by response of October 23, 2003, authored by Michael Tafelski for M.E. Ray, merely adopted the BP-9 response and relief denied. (Exhibit 25).

53. On November 1, 2003, plaintiff submitted his Central Office Appeal (BP-11), (exhibit 26), and by response of January 7, 2004, authored by Harrell Watts denied relief stating, "We do not find, nor have you provided, any evidence and substantiated your allegation the report prepared by the ... intern contains flawed and inaccurate information." (Exhibit 27). Plaintiff in fact provided information to refute this statement and showing the intern's report is flawed and inaccurate. (See, Exhibit 8).

22

54. At each stage of the grievance process plaintiff requested amending of the information in question as it is easily proven that no evidence exist to support defendants Berry and Pugh's report, or in the alternative that a new report written with focus on the challenged portions, none of which have been properly addressed.

## CONCLUSION

55. It is obvious that the Parole Board's spin is that all psychological problems are chronic and that no time and therapy could benefit a person which is clear from the Board's decision.

56. The Board used the report prepared by Berry and Pugh to deny parole, despite the fact that the report contains contradictory and misleading information, while defendant Baruch even agreed that the report was in plaintiff's favor, see exhibit 18, page 2 at ¶ 47 above, yet the Board was merely looking for any reason to deny plaintiff his freedom -- as the decision was pre-made by the Board to deny parole.

57. Defendants Berry and Pugh's report effectively prevented plaintiff from speaking - chilling speech. (See, ¶¶ 22, 23, 24 & 25 above).

58. There was absolutely no evidence for Berry and Pugh's diagnosis of narcissistic personality disorder and their recommendation in summary, as nothing in the record allows for such diagnosis.

59. Moreover, not once the Board even acknowledge Dr. Schwartz's report and "live testimony" conducted August 2001. Dr. Schwartz is a well-known and leading forensic expert who personally seen more than one thousand (1000) murderers, and Dr. Schwartz contradicted defendants Berry and Pugh's diagnosis and summary and recommendations.

23

60.  At no time Berry or Pugh even explained any testing and/or anything regarding the report; not once Berry and Pugh met with plaintiff together; and, when plaintiff had questions regarding regarding testing plaintiff was told not to worry about it.

61.  The Board was merely looking for any avenue to deny parole and not once reviewed Dr. Schwartz's report and/or "live testimony" at the hearing from the audio tapes of the August 2001 hearing; also, the Board not once reviewed plaintiff's extensive programming -- as the Examiner did not even had any of the documents with him at the hearing.

62.  Plaintiff has consistently accepted responsibility for his offense, to include taking responsibility at the initial hearing and at subsequent hearings, and plaintiff's extensive record of programming was never reviewed to show his rehabilitative efforts and acceptance of responsibility for his offense.

63.  Plaintiff's very "ill" parents had contacted James Hilkey, Ph.D., Retired Chief Forensic Psychologist, FCI Butner, who initially worked on plaintiff's criminal case.  Dr. Hilkey is a leading and well recognized forensic specialist in "risk factors."  He informed plaintiff's ill parents that he'd be willing to review the records along with defendants Berry and Pugh's report, coupled with defendant Baruch's commentary, as well as Dr. Schwartz's report and, if necessary, examined plaintiff and prepare a report; however, Dr. Hilkey needs permission from the Court to do so.

## RELIEF REQUESTED

1.  That the report prepared by Berry and Pugh be corrected based on facts, not personal animus by the Parole Board;

2.  That the Board give equal weight to Dr. Schwartz's report and "live testimony," as he effectively contradicted portions of Berry's report and summary and recommendations;

3.  That the Board give equal weight to Baruch's comments about the report being in plaintiff's favor;

4.  That the Court allow Dr. Hilkey, Retired Chief Forensic Psychologist, Bureau of Prisons, to conduct a review of the record and render his decision to the Court.  In the alternative, that the Court order a new report to be conducted at FCI Fort Dix, where plaintiff is confined and established with guards who could render input about his conduct, programming, work, overall demeanor, etc., because as plaintiff was sent to Petersburg to have the report prepared by defendants Berry and Pugh prejudiced him where no guards could provide input;

5.  As plaintiff has show throughout this Complaint that the report used to deny him parole contains inaccurate and misleading information that prejudiced him from being released, this Court should order defendants to either adhere to Dr. Schwartz's report, see exhibit 8, and defendant Baruch's comments, see exhibit 19 at page 2 or ¶ 47 above, or in the alternative order the Parole Board to review the reports de novo and/or allow a retired government forensic psychologist (Dr. Hilkey) to review the reports and submit his findings and recommendations;

6.  As plaintiff's release has been curtailed by the matter outlined in this complaint, plaintiff respectfully requests of "expedition of proceedings" in this action, as plaintiff is serving more time because the Board mischaracterized and misinterpreted the psychological report and denied his release based on the inaccurate report --- though plaintiff has been in continuous confinement more than 18 years;

7.   That the court conduct an evidentiary hearing as soon as possible;

8.   As expert review and testimony is necessary herein and plaintiff cannot afford counsel, he respectfully requests of the Court to appoint him counsel in an effort to get expert review.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is treu and correct to the best of my knowledge.

Respectfully submitted,

Latchmie Toolasprashad
10975-056
Building 5803
PO Box 7000
Ft. Dix, NJ  08640

Dated: January 24, March, 2004

## CERTIFICATE OF SERVICE

Plaintiff has not served a copy of this Complaint on the defendants, as the Court has to conduct its preliminary screening.  Thus upon completion of screening plaintiff respectfully requests of the Court to direct the U.S. Marshals Service to perfect service on plaintiff's behalf.

This the 24 th day of January March, 2004

Latchmie Toolasprashad